Jenny Harbine
Earthjustice
313 East Main Street
Bozeman, MT 59715
jharbine@earthjustice.org
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Plaintiffs*

Joshua Osborne-Klein
  (*pro hac vice pending*)
Wyatt F. Golding
  (*pro hac vice pending*)
Ziontz Chestnut
2101 Fourth Avenue, Suite 1230
Seattle, WA  98121
joshok@ziontzchestnut.com
wgolding@ziontzchestnut.com
(206) 448-1230 | Phone
(206) 448-0962 | Fax

*Counsel for Plaintiff Northern
Cheyenne Tribe*

Michael Saul
  (*pro hac vice pending*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
MSaul@biologicaldiversity.org
(303) 915-8308 | Phone

Anchun Jean Su
  (*pro hac vice pending*)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
jsu@biologicaldiversity.org
(510) 844-7100 | Phone
(510) 844-7150 | Fax

*Counsel for Plaintiff
Center for Biological Diversity*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| CITIZENS FOR CLEAN ENERGY, ECOCHEYENNE, MONTANA ENVIRONMENTAL INFORMATION CENTER, CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, SIERRA CLUB, and WILDEARTH GUARDIANS, | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs,

and

THE NORTHERN CHEYENNE TRIBE,

Plaintiff,

v.

U.S. DEPARTMENT OF THE INTERIOR;
U.S. SECRETARY OF THE INTERIOR; and
U.S. BUREAU OF LAND MANAGEMENT,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## INTRODUCTION

1.     This case challenges a decision by the Secretary of the Interior ("Secretary") to repeal a year-old moratorium on federal coal leasing by the Bureau of Land Management ("BLM") and abandon programmatic environmental review of the federal coal leasing program.  The prior presidential administration found this moratorium essential to ensure that such leasing is conducted, if at all, in a manner consistent with BLM's environmental obligations and mandate to secure a fair economic return to U.S. taxpayers from publicly owned coal.  In repealing the moratorium, Defendants Secretary of the Interior, Department of the Interior, and BLM (collectively, "Defendants") opened the door to new coal leasing and its attendant consequences without first performing an environmental review

1

evaluating the program's significant environmental, health, and economic impacts—including impacts from climate disruption caused by the burning of fossil fuels such as coal, and socioeconomic and environmental impacts to local communities.  In doing so, Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h.

2.      BLM's most recent full programmatic environmental review for the federal coal program was completed in 1979—38 years ago—at a time when the threat of climate change had not yet been fully realized or understood.  Since 1979, there have been fundamental shifts in our understanding of the impacts of the federal coal program, in addition to a plummeting need for federal coal to fuel our nation's electric sector.  Most importantly, an overwhelming body of evidence has developed demonstrating that continued reliance on fossil fuel-generated power will lead to a climate catastrophe, spurring 180 nations, including the United States, to commit in 2016 to greenhouse gas reductions to keep global temperature increases to no more than 1.5-2°C above pre-industrial levels.  Reducing reliance on coal-based energy is essential to achieving this objective.  Yet BLM has never completed a review of whether it can continue its coal leasing program and fulfill national climate commitments, as well as its statutory land-management obligations.

3.      In addition to the pressing need to address climate change, additional changed circumstances since 1979 not only warrant, but require, supplemental programmatic review of the federal coal leasing program.  As discussed below, while the federal coal leasing program generates significant environmental and social harm, it has failed to live up to aspirations to generate a fair economic return to American taxpayers.  Market changes have decreased demand for coal to fuel the domestic energy sector at the same time that technological advances have increased the availability of clean energy sources that obviate the need for federal coal.  In short, the policy and cost-benefit considerations underlying the federal coal leasing program—and its severe environmental impacts—have fundamentally shifted over the past 30-plus years.

4.      In January 2016, the then-Secretary under the Obama administration took the first steps toward complying with the government's obligations under NEPA by commencing a process to prepare a programmatic environmental impact statement ("PEIS") of the federal coal program and putting in place a moratorium on most new leasing activity until that review was complete.  See Secretarial Order No. 3338, Discretionary Programmatic Environmental Impact Statement to Modernize the Federal Coal Program (Jan. 15, 2016) ("Secretarial Order 3338"). Secretarial Order 3338 acknowledges that it is time for BLM to reevaluate the

environmental impacts of the federal coal program, as well as the fundamental need for new federal coal leasing at this time.

5.     Before such NEPA compliance could be realized, however, on March 29, 2017, the Secretary under the new Trump administration issued Secretarial Order  3348 reversing the prior administration's decision, thus fulfilling President Trump's political campaign promises to repeal the moratorium and increase our country's reliance on coal.  In doing so, the Secretary and BLM have opened the door to a host of harmful environmental, health, and economic impacts from new leases that have never been fully evaluated under NEPA.

6.     Defendants' lifting of the nationwide coal leasing moratorium is a major federal action that will result in significant environmental impacts. Defendants, however, failed to complete the PEIS, or even to prepare the less-detailed "environmental assessment," prior to making their decision to lift the moratorium, in violation of NEPA.

7.     To prevent significant, unstudied impacts from occurring, Plaintiffs Citizens for Clean Energy, ecoCheyenne, Montana Environmental Information Center, Center for Biological Diversity, Defenders of Wildlife, Sierra Club, WildEarth Guardians, and the Northern Cheyenne Tribe request that this Court find that the Defendants violated NEPA by issuing Secretarial Order 3348 without

first completing the requisite environmental analysis, vacate that order, and enjoin further federal coal leasing pending compliance with NEPA.

## JURISDICTION AND VENUE

8.     This action arises under NEPA, 42 U.S.C. §§ 4321-4370h, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

9.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.  Plaintiffs bring this action pursuant to the APA, 5 U.S.C. § 706, which waives Defendants' sovereign immunity, see id. § 702.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because plaintiffs Citizens for Clean Energy, Montana Environmental Information Center, ecoCheyenne, and the Northern Cheyenne Tribe reside in the District of Montana and land affected by the challenged action is within the District of Montana.  Venue is proper in this division because lead plaintiff Citizens for Clean Energy resides in Great Falls and federally owned coal subject to the federal coal leasing program lies in this division.

## PARTIES

11.     Plaintiff Citizens for Clean Energy, Inc. ("CCE") is an all volunteer group of Montana citizens from many backgrounds and political persuasions.

CCE's objective is to convince decision makers that adequate, clean, efficient, and cost effective energy for our community, state and world can be obtained without destroying our health, lifestyle, environment and heritage.  CCE members are united by a very deep concern about the harm fossil fuels cause to our world.  With all the wonderful resources available in this country, CCE asserts that there are many good solutions for clean power to serve our needs.  CCE believes the days of fossil fuel fired generators are now numbered.

12.    Plaintiff ecoCheyenne is a grassroots group of Northern Cheyenne tribal citizens formed to protect their environment from, among other things, the damaging impacts of coal mining.  For example, faced with the largest proposed coal mine in the nation (the Otter Creek mine) and associated coal railroad along the pristine Tongue River and Otter Creek Valley—interrelated projects adjacent to the Northern Cheyenne Indian Reservation and in the midst of sites with irreplaceable historical, cultural, and spiritual significance—ecoCheyenne conducted a major educational push among Northern Cheyenne tribal members about the significant potential harms from both projects.  ecoCheyenne also has partnered with members of the Lummi Nation of western Washington State to raise awareness about the impact of coal mining and burning, from the coal mines to the coal ports, on tribal communities throughout the Northwest.

13.     Plaintiff Montana Environmental Information Center ("MEIC") is a Montana-based nonprofit organization founded in 1973 with approximately 5,000 members and supporters throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the human environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations.  MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution.  MEIC and its members have intensive, long-standing recreational, aesthetic, scientific, professional, and spiritual interests in the responsible production and use of energy, the reduction of greenhouse gas pollution as a means to ameliorate our climate crisis, and the land, air, water, and communities impacted by fossil fuel development.

14.     Plaintiff Center for Biological Diversity ("the Center") is a non-profit corporation headquartered in Tucson, Arizona, with offices in Washington, DC, a number of states, and La Paz, Mexico.  The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.  Combining conservation biology with litigation, policy

7

advocacy, and strategic vision, the Center is working to secure a future for animals and plants hovering on the brink of extinction, for the wilderness they need to survive, and by extension, for the welfare of generations to come.  The Center is actively involved in endangered species and habitat protection issues nationwide and in Mexico, and has more than 52,300 members throughout the United States and the world, including 275 members who reside in Montana.  The Center has members in Montana and throughout the United States who are harmed by greenhouse gas emissions, mercury and other emissions from combustion of federal coal, and loss of wildlife habitat and recreation opportunity from federal coal leasing.  The Center and its members have participated in the coal Programmatic Environmental Impact Statement process, and submitted detailed scoping comments on the proposed federal coal leasing Programmatic Environmental Impact Statement, along with more than 20,000 letters from its members and supporters.

15.     Plaintiff Defenders of Wildlife ("Defenders") is a non-profit, membership organization headquartered in Washington, D.C. with field offices throughout the country, including an office in Missoula, Montana.  Founded in 1947, Defenders is a science-based conservation organization with more than 393,000 members nationwide, including approximately 1,700 members in Montana.  Many of Defenders' members reside and/or recreate within areas

impacted by the coal leasing moratorium.  Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitats on which they depend.  Defenders advocates new approaches to wildlife conservation that will help keep species from becoming endangered, and it employs education, litigation, research, legislation, and advocacy to defend wildlife and their habitat, including on federal lands.  Defenders brings this action on its own institutional behalf and on behalf of its members.

16.     Plaintiff Sierra Club is America's largest and most influential grassroots environmental organization, with more than 2.7 million members and supporters nationwide, including more than 2,500 who live in Montana.  Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  Sierra Club has been engaged in both litigation and non-litigation advocacy aimed at reform of the federal coal leasing program for many years. Sierra Club staff and volunteer supporters attended each of BLM's listening sessions regarding the federal coal program in July and August 2015 that were held in Billings, Montana; Denver, Colorado; Gillette, Wyoming; Farmington, New

Mexico; and Washington, D.C.  Sierra Club members and supporters also attended each of the six scoping meetings held by BLM on the federal coal leasing programmatic environmental review process that took place in the summer of 2016 in Casper, Wyoming; Salt Lake City, Utah; Knoxville, Tennessee; Seattle, Washington; Grand Junction, Colorado; and Pittsburgh, Pennsylvania.  Sierra Club continued to engage throughout this PEIS process by submitting detailed scoping comments to BLM along with more than 100,000 letters from its members and supporters.

17.    Plaintiff WildEarth Guardians is a non-profit conservation organization with major offices in Denver, Colorado; Santa Fe, New Mexico; and Missoula, Montana.  Guardians' mission is to protect and restore the wildlife, wild places, wild rivers, and health of the American West.  Guardians has over 200,000 members and supporters, many of whom live, work, and/or recreate on and adjacent to public lands in the West affected by coal mining and combustion. Through its Climate and Energy Program, Guardians utilizes advocacy, media, and litigation to protect its members and members of the public from the harm coal mining and coal combustion cause to air, land, wildlife, and public health.

18.    Plaintiff Northern Cheyenne Tribe ("the Tribe") has been a federally recognized Indian tribe since the Friendship Treaty of 1825.  See 81 Fed. Reg. 5,019, 5,022 (Jan. 29, 2016).  The Tribe's ancestral territory includes the Powder

River Basin of Montana and Wyoming.  The Tribe now occupies the Northern

Cheyenne Reservation ("the Reservation"), which is composed of approximately

444,000 acres of land in Big Horn County and Rosebud County, Montana.  More

than 99 percent of lands within the Reservation are held by the United States in

trust for the Tribe or the Tribe's members.  The Tribe also possesses off-

Reservation trust lands, including parcels along the Tongue River Reservoir in

close proximity to the Decker and Spring Creek coal mines in Montana.  The Tribe

has approximately 11,000 members, most of whom live on or in close proximity to

the Reservation.

19.     Protecting the Tribe's land and water is paramount to the survival and

identity of the Northern Cheyenne.  Since contact with the U.S. Government and

white settlers, the Tribe has sacrificed life and financial gain to maintain its lands

and culturally and spiritually significant sites for future generations; protect

culturally important plants and wildlife; preserve pristine air and water quality on

the Reservation; and improve the difficult economic conditions endured by the

Tribe's members and other residents of the Reservation.  For example, over the last

four decades, the Tribe took legal action to regain control of the mineral rights

underlying the Reservation in perpetuity; successfully challenged coal-related

development that would have surrounded the Reservation, including in the Tongue

River Valley; was the first tribe to designate its Reservation as a Class 1 air quality

region; adopted Tribal water quality standards, which were approved by the U.S. Environmental Protection Agency; and facilitated designation of three National Historic Landmarks outside the Reservation: (1) Rosebud Battlefield-Where the Girl Saved Her Brother on Rosebud Creek; (2) Wolf Mountains Battlefield-Where Big Crow walked Back and Forth on the Tongue River; and (3) Deer Medicine Rocks on Rosebud Creek.

20.    Plaintiffs' members use, live, work, hunt, recreate, and engage in cultural and spiritual practices in areas adversely affected by coal mine operations that are likely to be expanded by leases currently subject to the moratorium.  Their interests extend to the land, air, rivers and streams, wildlife, and cultural and spiritual resources that are harmed by coal mining.  In particular, Plaintiffs' members own and use lands overlying and adjacent to potential coal leases, hunt for and seek to view wildlife that would be displaced by new coal mining, breathe air and drink water that is threatened by pollution from new coal mining, collect culturally significant plants on lands that may be affected by potential coal leases, and engage in ceremonial practices that would be adversely affected by new coal mining.

21.    The aesthetic, conservation, recreational, wildlife preservation, and cultural and spiritual interests of plaintiffs and their members, staff, and volunteers are adversely and irreparably injured by the Defendants' failure to follow the

procedures required by NEPA.  These are actual, concrete injuries that are traceable to the Defendants' conduct and would be redressed by the requested relief.  Plaintiffs have no adequate remedy at law.

22.     Defendant U.S. Secretary of the Interior has supervisory responsibility over the Department of the Interior and the BLM.  The Secretary is sued in his official capacity.

23.     Defendant U.S. Department of the Interior is the federal department that oversees the U.S. Bureau of Land Management.

24.     Defendant U.S. Bureau of Land Management is a federal agency within the Department of the Interior.  BLM is responsible for implementing the federal coal program, including administering federal coal leasing.

## BACKGROUND

## I.     LEGAL BACKGROUND

### A.     NEPA

25.     NEPA "is our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA has two fundamental purposes: (1) to guarantee that agencies take a "hard look" at the consequences of their actions before the actions occur by ensuring that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349-50 (1989); and (2) to ensure that "the relevant

13

information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision," id. at 349.  "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that 'the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'" Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1216 (9th Cir. 1998) (internal citation omitted).

26.     Pursuant to NEPA, "all agencies of the Federal Government shall … include in every recommendation or report on … major Federal actions significantly affecting the quality of the human environment, a detailed statement … on (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action" (including a "No Action" alternative), and other environmental implications of the action.  42 U.S.C. § 4332(2)(C).  This environmental impact statement ("EIS") helps to ensure "that environmental concerns [will] be integrated into the very process of agency decision-making."  Andrus v. Sierra Club, 442 U.S. 347, 350 (1979).

> [B]y requiring agencies to take a "hard look" at how the choices before them affect the environment, and then to place their data and conclusions before the public, NEPA relies upon democratic processes to ensure … that "the most intelligent optimally beneficial decision will ultimately be made."

Or. Nat. Desert Ass'n v. BLM, 625 F.3d 1092, 1099-1100 (9th Cir. 2008)

(quoting Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy

Comm'n, 449 F.2d 1109, 1114 (D.C. Cir. 1971)) (internal citation omitted).

27.     In an EIS, federal agencies must analyze the direct, indirect, and

cumulative impacts of their actions.  See 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§

1508.7, 1508.8.  Indirect impacts "are caused by the action and are later in time or

farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. §

1508.8(b).  NEPA affirmatively requires "[r]easonable forecasting," and requires

agencies to provide information that is "essential to a reasoned choice among

alternatives," where the cost of obtaining the information is not exorbitant.  40

C.F.R. § 1502.22(a); Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy

Comm'n, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

28.     NEPA recognizes the need for programmatic environmental review

when the connected actions under a federal program "will have a compounded

effect on a region."  Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n, 677 F.2d

883, 888 (D.C. Cir. 1981); see also Kleppe v. Sierra Club, 427 U.S. 390, 400

(1976) (recognizing need for PEIS for federal coal leasing program); City of

Tenakee Springs v. Block, 778 F.2d 1402, 1407 (9th Cir. 1985) ("Where there are

large-scale plans for regional development, NEPA requires both a programmatic

and a site-specific EIS.  40 C.F.R. § 1508.28, 1502.20[.]").

> The thesis underlying programmatic EISs is that a
> systematic program is likely to generate disparate yet
> related impacts.  This relationship is expressed in terms
> of 'cumulation' of impacts or 'synergy' among impacts
> that are caused by or associated with various aspects of
> one big Federal action. …  In evaluating a
> comprehensive program design an agency administrator
> benefits from a programmatic EIS which indubitably
> promotes better decisionmaking.

Nat'l Wildlife Fed'n, 677 F.2d 888 (internal quotation marks, and alteration

omitted).

29.     NEPA also requires an agency to supplement a past EIS when there

are "significant new circumstances or information relevant to environmental

concerns and bearing on the proposed action or its impacts."  40 C.F.R.

§ 1502.9(c)(1)(ii).  Under NEPA, when "there remains 'major Federal actio[n]'

occur, and if the new information is sufficient to show that the remaining action

will 'affec[t] the quality of the human environment' in a significant manner or to a

significant extent not already considered, a supplemental EIS must be prepared."

Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 374 (1989) (quoting 42 U.S.C. §

4332(2)(C)).

### B.     Federal Coal Leasing Statutes

30.     Under the Mineral Leasing Act of 1920, 30 U.S.C. § 181 et seq. (as

amended by the Federal Coal Leasing Amendments Act of 1975 ("FCLAA"), Pub.

L. No. 94-377, 90 Stat. 1083 (Aug. 4, 1976)), BLM has broad authority to lease (or

not to lease) public lands for coal mining operations after conducting a competitive bidding process.  See 30 U.S.C. § 201(a)(1).  Key substantive limitations on that authority include the requirement under the Federal Lands Policy and Management Act ("FLPMA") to manage public lands for multiple uses, 43 U.S.C. §§ 1701(a)(7), which is defined as "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people," id. § 1702(c).

31.     In addition, the Mineral Leasing Act of 1920 as amended, requires BLM to only lease coal only in a manner that balances "long-term benefits to the public against short-term benefits."  30 U.S.C. § 201(a)(3) (requiring that lands subject to leasing be included in a land use plan); 43 U.S.C. § 1712(c)(7) (land use plans must "weigh long-term benefits to the public against short-term benefits" of proposed land uses).  Finally, under both FLPMA and the Mineral Leasing Act of 1920 as amended, BLM must "receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(9); see also 30 U.S.C. § 201(a)(1).

## II.     FACTUAL BACKGROUND

### A.     Federal Coal Program and Its Impacts

32.     The United States has the largest demonstrated coal reserve in the world.  The United States has an estimated 477 billion tons of coal, with 255 billion tons identified as recoverable.

33.     BLM is responsible for coal leasing on approximately 570 million acres where the coal mineral estate is owned by the Federal Government.  The surface estate of these lands is variously controlled by BLM, the United States Forest Service, private land owners, state land owners, or other Federal agencies. As of 2015, BLM managed 306 active federal coal leases in 11 states, authorizing coal mining on 482,691 acres under both public and private ownership.  Bureau of Land Mgmt., Total Federal Coal Leases in Effect, Total Acres Under Lease, and Lease Sales by Fiscal Year Since 1990, available at http://www.blm.gov/wo/st/en/prog/energy/coal_and_non-energy/coal_lease_table.html (last visited Mar. 29, 2017).  The vast majority of federal coal production—over 85%—is in the Powder River Basin of Montana and Wyoming, primarily on federal public lands.  The recoverable reserves of federal coal currently under lease are estimated to be sufficient to continue production from federal leases at current levels for 20 years.

34.     BLM's most recent full programmatic environmental review for the program was in 1979—38 years ago—at a time when the federal government's policy was to increase reliance on coal and the threat of climate change had not yet been fully realized or understood.  See Bureau of Land Mgmt., Final Environmental Statement:  Federal Coal Management Program (Apr. 1979) ("1979 PEIS").  The 1979 PEIS contains limited and insufficient analysis of impacts to

tribal governments and members, and contains no specific analysis of impacts to the Northern Cheyenne Tribe and its members. BLM committed to update its 1979 PEIS "when conditions change sufficiently to require new analyses of [national and interregional] impacts." Id. at 3-9.

35.     Preceding that analysis in 1973, in response to concerns about speculation in the coal leasing program, the Department of the Interior enacted Secretarial Order 2952, which imposed a "complete moratorium on the issuance of new coal prospecting permits, and a moratorium with limited exceptions on the issuance of new Federal coal leases." See Secretarial Order 3338, at 5. The moratorium was lifted in 1981, following completion of the 1979 PEIS and after a "new leasing system had been adopted through regulation." Id. at 6.

36.     Congress again imposed a moratorium on federal coal leasing in 1983, in response to concerns that lease sales in the Powder River Basin were not garnering fair market value. Id. The Interior Secretary extended the moratorium while the Department of Interior reviewed the leasing program and enacted modifications. Id. Following those modifications, the moratorium was lifted in 1987. Id.

37.     In the nearly four decades since the government last undertook environmental review of the federal coal program as a whole, there have been fundamental shifts in our understanding of the impacts of the program, in addition

19

to a plummeting need for federal coal to fuel our nation's electricity sector.  Most

significantly, BLM concedes that federal coal, when burned, accounts for nearly 14

percent of annual U.S. carbon dioxide emissions and 11 percent of total U.S.

greenhouse gas emissions.  An overwhelming body of evidence has developed

demonstrating that continued reliance on fossil fuel-generated power will lead to a

climate catastrophe.  The damaging results include more extreme weather events

and increasing levels of harmful pollution that cause increased illness and

mortality.  Further, large areas of the U.S. and the world face reduced water

supplies, increased water pollution, severe wildfires, and flooding from rising sea

levels among other devastating impacts.

38.     Recognition of these looming impacts in 2015 spurred 180 nations,

including the United States, to commit to greenhouse gas reductions aimed at

keeping global temperature increases to no more than 1.5-2°C above pre-industrial

levels pursuant to the Paris Agreement on climate change.  See Conference of

Parties No. 21, UNFCCC, Decision 1/CP.21, U.N. Doc. FCCC/CP/2015/10/Add.1

(Jan. 29, 2016), available at

http://unfccc.int/resource/docs/2015/cop21/eng/10a01.pdf (last visited Mar. 29,

2017).  The United States has translated this commitment to an economy-wide

target to reduce U.S. net greenhouse gas emissions 26 to 28 percent below 2005

levels by 2025, and a goal of putting the nation on a path to 80 percent reductions

by 2050.  United States, Intended Nationally Determined Contribution, Submission

to the UNFCCC Secretariat (2015), <u>available at</u>

http://www4.unfccc.int/Submissions/INDC/Published%20Documents/United%20S

tates%20of%20America/1/U.S.%20Cover%20Note%20INDC%20and%20Accom

panying%20Information.pdf (last visited Mar. 29, 2017).  The U.S. government

has never completed a review of whether it can continue its coal leasing program

and fulfill its climate commitments, as well as its land-stewardship obligations that

are placed in jeopardy by a changing climate.

     39.    In addition to the pressing need to address climate change, the

Department of the Interior and BLM have not examined on a programmatic level

new information and policies regarding the destructive impacts of federal coal

leasing on public land, water, wildlife, and culturally and spiritually significant

resources.  In a November 3, 2015 Memorandum, President Obama established a

policy for the Department of the Interior and other federal agencies that mining and

other development projects on America's public lands should result in a net

benefit—or at a minimum no net loss—for the nation's public lands, public waters,

and wildlife resources.  See Presidential Memorandum: Mitigating Impacts on

Natural Resources from Development and Encouraging Related Private Investment

(Nov. 3, 2015), published at 80 Fed. Reg. 68,743 (Nov. 6, 2015).  The Department

of the Interior and BLM have never examined whether resumption of the federal

21

coal leasing program will meet the "no net loss" policy established by the
Mitigation Memorandum.

40.    Moreover, new and mounting evidence demonstrates the significant
environmental, health, and economic impacts of coal production, transport, and
combustion.  The activities directly and indirectly associated with coal leasing
include, among other things, coal transport by rail, truck and sea, construction and
operation of infrastructure and equipment related to storing, shipping and
processing coal, coal combustion domestically and overseas, and disposal of coal
ash.  Each of these activities negatively impacts air and water quality in
downstream communities, harming their health, threatening their safety and
causing significant nuisance.  Potential impacts include adverse effects to air
quality on the Reservation, which is designated as a Class 1 air quality region
under the federal Clean Air Act, and adverse effects on water quality in
downstream segments of the Tongue River on the Reservation that are subject to
the Tribe's water quality standards (approved by the U.S. Environmental
Protection Agency in 2013).

41.    There is also a growing understanding of the environmental justice
implications of the federal coal program.  As BLM's Scoping Report recognized,
minority and low-income communities bear a disproportionate risk of suffering
adverse effects of climate disruption, as well as other undesirable environmental,

health, and economic externalities of mining, transporting, and burning coal.  In addition, over the last 38 years, researchers have developed an understanding of the impacts of energy booms and their unequal distribution of costs and benefits amongst local residents.  For example, the record in this case includes an expert economic analysis of the local economic impacts of coal mining describing, among other things, that coal-dependent communities generally exhibit poorer economic performance than communities not reliant on coal mining.  See Power Consulting, Inc., The Economic Consequences of the Federal Coal Leasing Program: Improving the Quality of the Economic Analysis, at 8-13 (July 27, 2016).

42.     While the federal coal leasing program generates significant environmental and social harm, it has failed to live up to aspirations to generate a fair return to American taxpayers.  Notably, in 2013, the U.S. Government Accountability Office and the Department of the Interior's Office of the Inspector General both released reports criticizing the non-competitive federal coal leasing process and other structural flaws that have resulted in below-market returns on federal coal in a manner not contemplated when the program was adopted, let alone any subsequent evaluations.

43.     At the same time, market changes have decreased demand for coal to fuel the domestic energy sector and technological advances have increased the availability of clean energy sources that obviate the need for federal coal.

44.     Because of these changed circumstances, NEPA mandates that BLM re-evaluate the environmental impacts of the federal coal leasing program and available alternatives for meeting our nation's energy needs.

**B.     Secretarial Order 3338 and Scoping Report**

45.     The federal government determined to address these critical deficiencies in its analysis of the federal coal program with Secretarial Order 3338. In announcing a moratorium on significant new leasing and the commencement of a PEIS process in January 2016, the Secretary of the Interior took the first steps toward complying with obligations under the Mineral Leasing Act of 1920, as amended, FLPMA, and NEPA.  The Secretarial Order cited the Interior Department's obligation "to ensure conservation of the public lands, the protection of their scientific, historic, and environmental values, and compliance with applicable environmental laws" as well as its "statutory duty to ensure a fair return to the taxpayer."  Secretarial Order 3338, at 7.

46.     Recognizing evidence of the federal coal program's likely inconsistency with these statutory obligations, the Secretary determined it was appropriate to suspend the federal coal program while BLM undertook a comprehensive review in a PEIS.  Id. at 8.  As the Secretary explained:

> Lease sales and lease modifications result in lease terms
> of 20 years and for so long thereafter as coal is produced
> in commercial quantities.  Continuing to conduct lease
> sales or approve lease modifications during this

programmatic review risks locking in for decades the
future development of large quantities of coal under
current rates and terms that the PEIS may ultimately
determine to be less than optimal. This risk is why,
during the previous two programmatic reviews, the
Department halted most lease sales with limited
exceptions for small sales, emergencies and other
situations involving potential economic hardship.
Considering these factors and given the extensive
recoverable reserves of Federal coal currently under
lease, I have decided that a similar policy is warranted
here.

Id. at 8.  The moratorium on most new federal coal leasing has remained in place

over the past year.

47.     Secretarial Order 3338 states that the PEIS should address, at a

minimum: (a) how, when, and where to lease coal; (b) fair return to the American

public for federal coal; (c) the climate change impacts of the federal coal program,

and how best to protect the public lands from climate change impacts; (d) the

externalities related to federal coal production, including environmental and social

impacts; (e) whether lease decisions should consider whether the coal would be for

export; and (f) the degree to which federal coal fulfills the energy needs of the

United States.  Id. at 7-8.

48.     In March 2016, the Secretary issued a Notice of Intent to Prepare a

Programmatic Environmental Impact Statement to Review the Federal Coal

Program and to Conduct Public Scoping Meetings.  81 Fed. Reg. 17,720 (Mar. 30,

2016). The Secretary's outreach included inviting 212 impacted tribal nations,

including the Northern Cheyenne Tribe, to engage in government to government consultation.  See U.S. Dep't of Interior, Federal Coal Program, Programmatic Environmental Impact Statement – Scoping Report, at ES-3–5 to 3–6 (Jan, 2017). During the spring and summer of 2016, BLM accepted more than 200,000 public comments and held public meetings in various cities regarding its programmatic review of the federal coal program.  Members of Plaintiff organizations and the Northern Cheyenne Tribe commented in support of continuing a moratorium on coal leasing.

49.    On January 11, 2017, BLM completed the first stage of its NEPA review and released a scoping report detailing the agency's conclusions based on its initial review of the public comments and expert analysis.  See U.S. Dep't of Interior, Federal Coal Program, Programmatic Environmental Impact Statement – Scoping Report, at ES-3–4 (Jan, 2017). The scoping report concluded "that modernization of the Federal coal program is warranted."  Id. at ES-4.  "The three general areas requiring modernization are:  fair return to Americans for the sale of their public coal resources; impact of the program on the challenge of climate change and on other environmental issues; and efficient administration of the program in light of current market conditions including impacts on communities."  Id. at 6-2.

50.     The scoping report identified a number of alternatives that would be studied in the PEIS to inform BLM's decision about appropriate modifications to the coal program.  The alternatives included options for increasing royalty rates paid by coal producers and avoiding or mitigating the program's climate-change impacts.  <u>Id.</u> at 6-28–32.   Additionally, the Scoping Report identified an alternative that would end federal coal leasing, an alternative that would limit the amount of federal coal leased at a given time based on a carbon budget, and a "no-action" alternative that would leave the pre-moratorium leasing program in place. <u>Id.</u> at 6-31–32.

51.     "Under the no action alternative, the Federal coal program would continue to be administered in the manner in which it is administered currently. … The no action alternative would not address concerns raised by numerous parties about the Federal coal program, including concerns raised by the GAO, the [Office of the Inspector General], members of Congress, interested stakeholders, and the public."  <u>Id.</u> at 32.

52.     BLM identified pending lease applications that were suspended pending completion of the PEIS.  Those projects "may proceed with NEPA and other related analyses at the applicant's request during the programmatic review; however, the BLM will not make final decisions on new leases until the comprehensive review is completed."  BLM, Status of Currently Pending Lease

and Lease Modification Applications (Feb. 5, 2016), <u>available at</u>

<u>https://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_</u>

<u>affairs/news_release_attachments.Par.16330.File.dat/Status%20of%20Pending%20</u>

<u>Leases.pdf</u> (last visited Mar. 29, 2017).

53.     Those projects encompass a minimum of 1.86 billion tons of coal in

nine states, <u>id.</u>, roughly equivalent to a 4-5 year supply of federal coal from all

federal mines.  The pending lease applications subject to the moratorium include

four leases encompassing 426 million tons of coal adjacent to the Decker and

Spring Creek mines in Montana.  <u>Id.</u>

### C.     Trump Administration's Secretarial Order 3348

54.     On the campaign trail, then-candidate Trump pledged to eliminate the

moratorium on federal coal leasing and increase our nation's reliance on fossil

fuels.  <u>See</u> <u>https://www.whitehouse.gov/the-press-office/2017/02/16/president-</u>

<u>trump-putting-coal-country-back-work</u> (last visited Mar. 29, 2017).  Now,

President Trump has fulfilled that political promise.

55.     On March 28, 2017, President Trump issued an executive order

directing the Secretary of the Interior to "take all steps necessary and appropriate to

amend or withdraw Secretary's Order 3338 dated January 15, 2016 (Discretionary

Programmatic Environmental Impact Statement (PEIS) to Modernize the Federal

Coal Program), and to lift any and all moratoria on Federal land coal leasing

activities related to Order 3338. The Secretary shall commence Federal coal leasing activities consistent with all applicable laws and regulations."

56.     The following day, March 29, 2017, Interior Secretary Ryan Zinke issued Secretarial Order 3348, which revokes Secretarial Order 3338, thus lifting the moratorium on federal coal leasing and terminating the PEIS process.  The Order directs BLM "to process coal lease applications and modifications expeditiously in accordance with regulations and guidance existing before the issuance of Secretary's Order 3338." Secretarial Order 3348 also orders the immediate cessation of all activities associated with the Programmatic Environmental Impact Statement process.

57.     In response to reports that the Trump Administration planned to eliminate the moratorium on federal coal leasing, the Northern Cheyenne Tribe transmitted a letter to Secretary Zinke on March 2, 2017, raising concern that the federal coal leasing program could have significant environmental and socioeconomic impacts on the Tribe and its members and requesting government-to-government consultation regarding the federal coal leasing program prior to any decision to lift or otherwise modify the moratorium.  Despite the trust relationship between the Department of the Interior and the Tribe, and fiduciary obligations Secretary Zinke has to the Tribe, the Tribe did not receive a response from Secretary Zinke or the Department of the Interior prior to the issuance of

Secretarial Order 3348 and the requested government-to-government consultation on the federal coal leasing program has not occurred.

58.     In effect, Defendants' decision to repeal the moratorium was a premature selection of the "no-action" alternative, without the requisite analysis to inform that selection.  The decision threatens to accomplish what Secretarial Order 3338 sought to avoid by "locking in for decades the future development of large quantities of coal under current rates and terms that the PEIS may [have] ultimately determine[d] to be less than optimal."  Secretarial Order 3338, at 8.

59.     Because Secretarial Order 3348 opens the door to federal coal leasing and its harmful environmental impacts that have not been evaluated in a PEIS or a supplemental PEIS, the Order violates NEPA.

**FIRST CLAIM FOR RELIEF**
(Violation of NEPA, 42 U.S.C. § 4332(2)(C) and APA, 5 U.S.C. § 706(2)(A)—
Failure to Prepare PEIS)

60.     Plaintiffs hereby reallege and reincorporate Paragraphs 1 through 59.

61.     Absent the decision to repeal the federal coal leasing moratorium, coal-lease applicants would have no ability to move forward with leasing and mining.  The decision thus opened the door to the significant environmental impacts that accompany leasing and mining.

62.     Accordingly, the decision to repeal the federal coal leasing moratorium is a "major Federal action[] significantly affecting the quality of the

human environment" that requires preparation of an EIS.  42 U.S.C. § 4332(2)(C);

see also 40 C.F.R. § 1508.18(a) (major federal actions "include new and

continuing activities" and "new or revised agency rules, regulations, plans,

policies, or procedures").  Further, a PEIS is required because the repeal gives rise

to a comprehensive program with widespread, cumulative environmental effects.

Kleppe, 427 U.S. at 400.

63.     The significant environmental impacts of the decision to end the

federal coal leasing moratorium include, but are not limited to, greenhouse gas

emissions and the resulting impacts on climate change, air and water quality, land,

fish and wildlife, and human health.  The challenged decision is also related to

other actions with cumulatively significant environmental impacts, and may

adversely affect threatened and endangered species, requiring an EIS.  40 C.F.R. §

1508.27(b).

64.     In ending the federal coal leasing moratorium without first completing

a PEIS to evaluate the federal coal program's significant, unstudied environmental

impacts, Defendants violated NEPA, 42 U.S.C § 4332(2)(C), and the APA's

requirement for rational, rather than arbitrary, decisionmaking, 5 U.S.C.

§ 706(2)(A).  Secretarial Order 3348 should therefore be held unlawful and set

aside.  Id.

65.     By abruptly reversing Secretarial Order 3338 without adequate rationale, Defendants took agency action that violated the APA's requirement for rational, rather than arbitrary, decisionmaking. 5 U.S.C. § 706(2)(A). Secretarial Order 3348 should therefore be held unlawful and set aside.

66.     By ending the federal coal leasing moratorium in violation of NEPA and the APA, Defendants violated their sacred trust responsibility to the Northern Cheyenne Tribe.  Secretarial Order 3348 should therefore be held unlawful and set aside.

## SECOND CLAIM FOR RELIEF
(Violation of NEPA, 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.9(c)(1)(ii), and APA, 5 U.S.C. § 706(2)(A)—
Failure to Prepare Supplemental PEIS)

67.     Plaintiffs hereby reallege and reincorporate Paragraphs 1 through 66.

68.     In the alternative to preparing a PEIS on the decision to repeal the federal coal leasing moratorium, Defendants were required under NEPA to complete a supplement to the 1979 PEIS to evaluate "significant new circumstances or information relevant to environmental concerns and bearing on the [proposal to modify or resume the federal coal program] or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

69.     Defendants' decision to repeal the federal coal leasing moratorium without first completing the PEIS that was intended to evaluate modifications to

the federal coal program was a significant decision regarding the implementation of the federal coal program.

70.     Because Defendants issued Secretarial Order 3348 without first completing a supplemental PEIS—or even meaningfully evaluating whether such supplemental environmental review was required—Defendants violated NEPA, 42 U.S.C § 4332(2)(C); 40 C.F.R. § 1502.9(c)(1)(ii), and the APA's requirement for rational, rather than arbitrary, decisionmaking, 5 U.S.C. § 706(2)(A). Secretarial Order 3348 should therefore be held unlawful and set aside.  Id.

71.     By issuing Secretarial Order 3348 in violation of NEPA and the APA, Defendants violated their sacred trust responsibility to the Northern Cheyenne Tribe. Secretarial Order 3348 should therefore be held unlawful and set aside.

## RELIEF REQUESTED

THEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that Defendants violated NEPA by failing to complete a PEIS prior to ending the federal coal leasing moratorium;

2.     In the alternative, declare that Defendants violated NEPA by failing to complete a supplemental PEIS prior to ending the federal coal leasing moratorium;

3.     Declare that Defendants violated the APA by arbitrarily and capriciously reversing Secretarial Order 3338;

4.     Declare that Defendants violated their sacred trust duty to the

Northern Cheyenne Tribe;

5.     Set aside and vacate Defendants' decision to end the coal leasing

moratorium;

6.     Enjoin further federal coal leasing pending completion of the requisite

NEPA analysis;

7.     Award to Plaintiffs their reasonable fees, costs, and expenses,

including attorneys fees, associated with this litigation; and

8.     Grant Plaintiffs such further and additional relief as the Court may

deem just and proper.

Respectfully submitted this 29th day of March, 2017.

/s/ Jenny K. Harbine
Jenny Harbine
Earthjustice
313 East Main Street
Bozeman, MT 59715
jharbine@earthjustice.org
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Plaintiffs*

Michael Saul
  (*pro hac vice pending*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
MSaul@biologicaldiversity.org
(303) 915-8308 | Phone

Anchun Jean Su
  (*pro hac vice pending*)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
jsu@biologicaldiversity.org
(510) 844-7100 | Phone
(510) 844-7150 | Fax

*Counsel for Plaintiff*
*Center for Biological Diversity*

Joshua Osborne-Klein
  (*pro hac vice pending*)
Wyatt F. Golding
  (*pro hac vice pending*)
Ziontz Chestnut
2101 Fourth Avenue, Suite 1230
Seattle, WA  98121
joshok@ziontzchestnut.com
wgolding@ziontzchestnut.com
(206) 448-1230 | Phone
(206) 448-0962 | Fax

*Counsel for Plaintiff Northern*
*Cheyenne Tribe*

CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of March, 2017, I served a copy of the foregoing on the defendants in the above-captioned matter by sending a copy via First Class Mail to each of the following addresses:

> Ryan Zinke
> Office of the Secretary
> U.S. Department of the Interior
> 1849 C Street, N.W.
> Washington, D.C. 20240
>
> Office of the Secretary
> U.S. Department of the Interior
> 1849 C Street, N.W.
> Washington, D.C. 20240
>
> Office of the Director
> Bureau of Land Management
> U.S. Department of the Interior
> 1849 C Street, N.W., Rm. 5665
> Washington, D.C. 20240

/s/ Jenny K. Harbine
Jenny Harbine