Jenny K. Harbine
Earthjustice
313 East Main Street
Bozeman, MT 59715
jharbine@earthjustice.org
(406) 586-9699 | Phone
(406) 586-9695 | Fax

Edward B. Zukoski (*pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
tzukoski@earthjustice.org
(303) 623-9466 | Phone
(303) 623-8083 | Fax

*Counsel for Plaintiffs*

Wyatt F. Golding (*pro hac vice*)
Ziontz Chestnut
2101 Fourth Avenue, Suite 1230
Seattle, WA  98108
wgolding@ziontzchestnut.com
(206) 448-1230 | Phone
(206) 448-0962 | Fax

*Counsel for Plaintiff Northern Cheyenne
Tribe*

Michael Saul (*pro hac vice*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
MSaul@biologicaldiversity.org
(303) 915-8308 | Phone

Anchun Jean Su (*pro hac vice*)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
jsu@biologicaldiversity.org
(510) 844-7100 | Phone
(510) 844-7150 | Fax

*Counsel for Plaintiff
Center for Biological Diversity*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| CITIZENS FOR CLEAN ENERGY, <u>et</u> <u>al.</u>,<br>          Plaintiffs,<br><br>and<br><br>THE NORTHERN CHEYENNE TRIBE,<br><br>          Plaintiff,<br><br>     v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, <u>et</u> <u>al.</u>,<br><br>          Defendants,<br><br>and<br><br>STATE OF WYOMING, <u>et</u> <u>al.</u>,<br><br>          Defendant-Intervenors. | Case No. 4:17-cv-30-BMM<br><br><br><br><br><br>**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| STATE OF CALIFORNIA, <u>et</u> <u>al.</u>,<br><br>          Plaintiffs,<br><br>     v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, <u>et</u> <u>al.</u>,<br><br>          Defendants,<br><br>and<br><br>STATE OF WYOMING, <u>et</u> <u>al.</u>,<br><br>          Defendant-Intervenors. | Case No. 4:17-cv-42-BMM<br>(consolidated case) |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

I.   THE TRIBE AND CONSERVATION PLAINTIFFS' NEPA
     CLAIMS ARE JUSTICIABLE ........................................................2

     A.   The Tribe and Conservation Plaintiffs Have Standing to Pursue
          their NEPA Claims...............................................................2

     B.   The Tribe and Conservation Plaintiffs' NEPA Claims are Ripe ........10

     C.   S.O. 3348 is a Final Agency Action under the APA..........................11

II.  FEDERAL DEFENDANTS VIOLATED NEPA .........................................15

     A.   S.O. 3348 Was a Major Federal Action under NEPA .......................17

     B.   Federal Defendants Offered No Legitimate Rationale for
          Reversing their Finding that New Coal Leases Would Make
          Irretrievable Resource Commitments .....................................25

     C.   NEPA Required Federal Defendants' to Consider the Impacts
          of Ending the Moratorium on the Northern Cheyenne Tribe.............28

III. BY VIOLATING NEPA, FEDERAL DEFENDANTS ALSO
     VIOLATED THEIR GENERAL TRUST OBLIGATION TO THE
     NORTHERN CHEYENNE TRIBE .............................................30

IV.  THIS COURT SHOULD VACATE S.O. 3348 ..........................................32

CONCLUSION .........................................................................34

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alsea Valley All. v. Dep't of Commerce,
   358 F.3d 1181 (9th Cir. 2004) ..............................................................34

Am. Pub. Transit Ass'n v. Goldschmidt,
   485 F. Supp. 811 (D.D.C. 1980), rev'd on other grounds sub nom.
   Am. Pub. Transit Ass'n v. Lewis, 655 F.2d 1272 (D.C. Cir. 1981)...................22

Appalachian Power Co. v. E.P.A.,
   208 F.3d 1015 (D.C. Cir. 2000)............................................... 14-15, 15

Arpin v. Santa Clara Valley Transp. Agency,
   261 F.3d 912 (9th Cir. 2001) ................................................... 33-34

Bennett v. Spear,
   520 U.S. 154 (1997).........................................................12, 13, 14, 15

Cal. Wilderness Coal. v. U.S. Dep't of Energy,
   631 F.3d 1072 (9th Cir. 2011) ...............................................19, 20, 21

California v. Block,
   690 F.2d 753 (9th Cir. 1982) ................................................. 22, 24-25

Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,
   333 U.S. 103 (1948).........................................................................12

Citizens for Better Forestry v. U.S. Dep't of Agric.,
   341 F.3d 961 (9th Cir. 2003) ................................................. 3-4, 4, 11

Citizens for Better Forestry v. U.S. Dep't of Agric.,
   481 F. Supp. 2d 1059 (N.D. Cal. 2007)...........................................22

Clapper v. Amnesty Int'l USA,
   568 U.S. 398 (2013).............................................................. 8-9, 9

Columbia Riverkeeper v. U.S. Coast Guard,
   761 F.3d 1084 (9th Cir. 2014) ...........................................................15

Cottonwood Envtl. Law Ctr. v. U.S. Forest Service,
   789 F.3d 1075 (9th Cir. 2015) ...........................................4, 5, 9, 11

Ctr. for Biological Diversity v. Zinke,
    260 F. Supp. 3d 11 (D.D.C. 2017) ....................................................................13

Envtl. Def. Fund, Inc. v. Andrus,
    596 F.2d 848 (9th Cir.1979) ...........................................................................20

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,
    528 U.S. 167 (2000)........................................................................................3

Gros Ventre Tribe v. United States,
    469 F. 3d 801 (9th Cir. 2006) .........................................................................31

Havasupai Tribe v. Provencio,
    876 F.3d 1242 (9th Cir. 2017) ..................................................................14, 15

Hunt v. Wash. State Apple Advert. Comm'n,
    432 U.S. 333 (1977).........................................................................................3

Idaho Conservation League v. U.S. Forest Serv.,
    No. 2:12-CV-00004-REB, 2014 WL 912244 (D. Idaho Mar. 10,
    2014) ...............................................................................................................9

Inter Tribal Council of Ariz. v. Babbitt,
    51 F.3d 199 (9th Cir. 1995) ............................................................................31

Kern v. U.S. Bureau of Land Mgmt.,
    284 F.3d 1062 (9th Cir. 2002) ........................................................................11

Kleppe v. Sierra Club,
    427 U.S. 390 (1976).......................................................................................21

Krueger v. Morton,
    539 F.2d 235 (D.C. Cir. 1976)........................................................................24

Cal. ex rel. Lockyer v. U.S. Dep't of Agric.,
    459 F. Supp. 2d 874 (N.D. Cal. 2006), opinion clarified, No. C05-
    03508 EDL, 2006 WL 2827903 (N.D. Cal. Oct. 3, 2006) ...............................14

Cal. ex rel. Lockyer v. U.S. Dep't of Agric.,
    575 F.3d 999 (9th Cir. 2009) ......................................................... 14, 20-21, 21

Lujan v. Defs. of Wildlife,
    504 U.S. 555 (1992).........................................................................................9

Monsanto Co. v. Geertson Seed Farms,
 561 U.S. 139 (2010)................................................................33

N. Cheyenne Tribe v. Hodel,
 Case No. CV 82-116-BLG, 12 Indian Law Rep. 3065
 (D. Mont. May 28, 1985), rev'd on other grounds, 851
 F.2d 1152 (9th Cir. 1988). ....................................... 28-29, 29, 31, 32

N. Cheyenne Tribe v. Lujan,
 804 F. Supp. 1281 (D. Mont. 1991)........................................ 30-31

Northcoast Envtl. Ctr. v. Glickman,
 136 F.3d 660 (9th Cir. 1998) .......................................19, 20

Ohio Forestry Ass'n v. Sierra Club,
 523 U.S. 726 (1998)................................................10, 11

Okanogan Highlands All. v. Williams,
 236 F.3d 468 (9th Cir. 2000) ..........................................3

ONRC Action v. Bureau of Land Mgmt.,
 150 F.3d 1132 (9th Cir. 1998) ........................................13

Or. Nat. Desert Ass'n v. U.S. Forest Serv.,
 465 F.3d 977 (9th Cir. 2006) .......................................12, 14

Organized Vill. of Kake v. U.S. Dep't of Agric.,
 795 F.3d 956 (9th Cir. 2015) (en banc) .....................................26, 28

Parsons v. U.S. Dep't of Justice,
 801 F.3d 701 (6th Cir. 2015) ...........................................9

Paulsen v. Daniels,
 413 F.3d 999 (9th Cir. 2005) ..........................................33

Pit River Tribe v. U.S. Forest Serv.,
 469 F.3d 768 (9th Cir. 2006) ......................................19, 30

Port of Boston Marine Terminal Ass'n. v. Rederiaktiebolaget
 Transatlantic,
 400 U.S. 62 (1970)................................................13

Res. Ltd., Inc. v. Robertson,
 35 F.3d 1300 (9th Cir. 1994) ...............................................................4

S. Fork Band v. U.S. Dep't of Interior,
 643 F. Supp. 2d 1192 (D. Nev.), aff'd in part, rev'd in part sub
 nom. S. Fork Band Council of W. Shoshone of Nevada v. U.S.
 Dep't of Interior, 588 F.3d 718 (9th Cir. 2009)....................................6

Salmon River Concerned Citizens v. Robertson,
 32 F.3d 1346 (9th Cir. 1994) ........................................................... 4-5

Seattle Audubon Soc'y. v. Espy,
 998 F.2d 699 (9th Cir. 1993) ...............................................................4

Sierra Club v. Morton,
 514 F.2d 856 (D.C. Cir. 1975), rev'd sub nom. Kleppe v. Sierra
 Club, 427 U.S. 390 (1976)..................................................................24

Sierra Forest Legacy v. Sherman,
 646 F.3d 1161 (9th Cir. 2011) ........................................................ 4, 8-9

W. Watersheds Project v. Kraayenbrink,
 632 F.3d 472 (9th Cir.2011) ...................................................5, 8, 9, 10

Western Org. of Res. Councils v. Zinke,
 892 F.3d 1234 (D.C. Cir. 2018)............................................17, 23, 24

Whitman v. Am. Trucking Ass'ns,
 531 U.S. 457 (2001).............................................................................12

WildEarth Guardians v. U.S. Dep't of Agric.,
 795 F.3d 1148 (9th Cir. 2015) .........................................................5, 8

## STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. § 704.......................................................................................2, 11
 § 706(2) ......................................................................................15
 § 706(2)(A) & (D) ................................................................ 32-33, 34

42 U.S.C. § 4332(2)(C)..............................................17, 18, 27, 28, 29

## REGULATIONS AND ADMINISTRATIVE MATERIALS

40 C.F.R. § 1501.2 ...................................................................................29

      § 1501.7(a)(1) ..........................................................................9, 29, 32

      § 1502.4(b)........................................................................................19

      § 1502.9(c)(1) ...................................................................................17

43 C.F.R. § 3420.0-2 ...............................................................................32

Federal Defendants cannot evade compliance with their obligation under the National Environmental Policy Act ("NEPA") to evaluate the significant environmental consequences of opening up thousands of acres of public land to coal leasing and development.  By issuing Secretarial Order ("S.O.") 3348, Federal Defendants ended a prohibition on most coal leasing.  That moratorium was adopted in 2016 to ensure that, if and when leasing resumed in the future, it would account for the serious impacts of coal development on our global climate and ensure that taxpayers receive a fair economic return.  Arguments by Federal Defendants, the States of Wyoming and Montana ("State Defendants"), and the National Mining Association ("NMA") (collectively, "Defendants") that S.O. 3348 was inconsequential ring hollow, where the Order's direct result and stated purpose was to stimulate increased leasing, mining, and burning of coal.  The question before this Court is not whether Federal Defendants had "policy discretion" to issue S.O. 3348, Fed. Resp. 36, but rather whether NEPA required them to first examine the Order's environmental harm and reasonable alternative courses of action.  Indeed, informing such discretionary decision-making is the very purpose of NEPA.  Federal Defendants' failure to conduct environmental review before issuing S.O. 3448 violated NEPA, as well as their trust obligation to the Northern Cheyenne Tribe, which required, at a minimum, Federal Defendants' compliance with general regulations and statutes.

Largely side-stepping these dispositive questions, Defendants' responses focus on shielding S.O. 3348 from judicial review.  They argue that the Tribe and Conservation Plaintiffs lack standing to pursue their NEPA claims, the claims are not ripe, and S.O. 3348 was not a final action subject to this Court's review.  None of these arguments has merit.

Because S.O. 3348 violated NEPA and Federal Defendants' trust obligation to the Northern Cheyenne Tribe, it should be set aside.

## I.   THE TRIBE AND CONSERVATION PLAINTIFFS' NEPA CLAIMS ARE JUSTICIABLE

Defendants' claims that this Court lacks jurisdiction to consider the Tribe and Conservation Plaintiffs' NEPA claims should fail.  The Tribe and Conservation Plaintiffs have standing, their claims are ripe, and they challenge "final agency action" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 704.

### A.   The Tribe and Conservation Plaintiffs Have Standing to Pursue their NEPA Claims

Defendants' challenge to the Tribe and Conservation Plaintiffs' standing is meritless.  To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.</u>, 528 U.S. 167, 180–81 (2000).  An association may sue "on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Id.</u> at 181 (citing <u>Hunt v. Wash. State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977)).  Of these requirements, Federal Defendants raise issues regarding only the injury-in-fact and causation elements of Article III standing.  Fed. Resp. 17.

At the outset, Defendants ignore that this is a procedural injury case in which Plaintiffs are harmed by the Federal Defendants' failure to comply with NEPA's environmental analysis requirements.  NEPA's primary purposes are to "ensure[ ] that federal agencies are informed of environmental consequences before making decisions and that the information is available to the public." <u>Okanogan Highlands All. v. Williams</u>, 236 F.3d 468, 473 (9th Cir. 2000).  Thus, the harm from Federal Defendants' failure to comply with NEPA before ending the coal-leasing moratorium "consists of added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment." <u>Citizens for Better Forestry v. U.S. Dep't of Agric.</u>, 341 F.3d

961, 971 (9th Cir. 2003); see also Seattle Audubon Soc'y. v. Espy, 998 F.2d 699, 703 (9th Cir. 1993) (finding standing based on harm "that environmental consequences might be overlooked, as a result of deficiencies in the government's analysis under environmental statutes") (quotation omitted).  Contrary to Federal Defendants' argument that the Tribe and Conservation Plaintiffs lack standing for their NEPA claim until after coal is leased and mining is approved in subsequent steps of the development process, Fed. Resp. 17-18, 19, "a procedural injury is complete" at the time Federal Defendants take an action without observing the requisite NEPA procedures.  Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1179 (9th Cir. 2011) (emphasis added).  Such a procedural injury gives rise to standing for a programmatic NEPA challenge.

Repeatedly, the Ninth Circuit has affirmed plaintiffs' standing to challenge programmatic decisions that "impose or remove requirements on site-specific" actions.  Citizens for Better Forestry, 341 F.3d at 975; see also Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv., 789 F.3d 1075, 1081 (9th Cir. 2015) (finding standing to challenge programmatic management direction); Res. Ltd., Inc. v. Robertson, 35 F.3d 1300, 1303 (9th Cir. 1994) ("To the extent that the [programmatic] plan predetermines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge."); Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1355 (9th Cir. 1994) (affirming

plaintiffs' standing to challenge EIS for vegetation management plan, stating that "unfettered use of herbicides … in the absence of NEPA compliance will cause harm to visitors' recreational use and enjoyment, if not to their health.  Speculation that the application of herbicides might not occur is irrelevant").

To satisfy the injury-in-fact requirement for such a procedural claim under NEPA, "a plaintiff 'must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing.'"  WildEarth Guardians v. U.S. Dep't of Agric., 795 F.3d 1148, 1154 (9th Cir. 2015) (quoting W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 485 (9th Cir.2011)).  To demonstrate a concrete interest, a plaintiff must show "a geographic nexus between the individual asserting the claim and the location suffering an environmental impact."  Id. (quotation omitted).  "Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."  Id. (quotation omitted); see also Cottonwood Envtl. Law Ctr., 789 F.3d at 1079 (stating "[a]n organization can satisfy the concrete harm requirement by alleging an injury to the recreational or even the mere esthetic interests of its members") (quotation omitted).

Here, the Tribe's concrete interest is documented in the declaration of William Walksalong, who explains that "the Northern Cheyenne Reservation is

surrounded by coal mines, including … the Decker and Spring Creek mines to the South." Walksalong Dec. ¶ 9.  Federal Defendants' action terminating the coal-leasing moratorium opened the door to new leasing and mining at Decker and Spring Creek, id. ¶ 12, which cause air and water pollution on the reservation, destroy habitat for sensitive species, and "destroys important cultural sites, including sites used for Cheyenne ceremonies." Walksalong Dec. ¶ 10.  New coal leasing and mining near the Reservation and throughout Northern Cheyenne ancestral homelands harms the Tribe and its members.  Id.  These interests are sufficient to afford the Tribe standing.  S. Fork Band v. U.S. Dep't of Interior, 643 F. Supp. 2d 1192, 1202-03 (D. Nev.) (holding that tribe had associational standing to sue on behalf of tribal members), aff'd in part, rev'd in part sub nom. S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior, 588 F.3d 718 (9th Cir. 2009).

The Conservation Plaintiffs likewise documented their members' recreational and occupational use of areas that would have been protected from new coal leasing and mining under the coal-leasing moratorium that Federal Defendants terminated without NEPA compliance.  For example, Art Hayes ranches in southeastern Montana downstream from the Decker and Spring Creek mines, and relies on Tongue River water for irrigation.  Hayes Dec. ¶¶ 2-4.  Mr. Hayes explained that these mines pollute the Tongue River and impair its use for

agricultural purposes.  Id. ¶¶ 4, 7.  While the coal-leasing moratorium prevented the Bureau of Land Management ("BLM") from issuing lease applications to expand the footprint and extend the life of these mines, under S.O. 3348, BLM may move forward with processing and issuing those leases.  Id. ¶¶ 5, 7.  S.O. 3348 therefore threatens Mr. Hayes with harm to his enjoyment of his property and his livelihood.  Id. ¶ 8.

The declarations of Steve Gilbert, Jeremy Nichols, Tim Peterson, and Jonathan Proctor similarly document Plaintiffs' members' extensive use of areas in Montana, Wyoming, and Utah that will be affected by the issuance of pending coal lease applications that had been halted under the moratorium.  Gilbert Dec. ¶ 14; Nichols Dec. ¶¶ 23-24, 38-39; Peterson Dec. ¶ 14; Proctor Dec. ¶ 12.  Messrs. Gilbert, Nichols, Peterson, and Proctor document the harm to their enjoyment of these areas from the noise, air pollution, and visual impacts of adjacent mining, and explain how these impacts would be worsened by the issuance of pending leases, as allowed under S.O. 3348.  Gilbert Dec. ¶¶ 5-11, 14-15; Nichols Dec. ¶¶ 32-39; Peterson Dec. ¶¶ 8-15; Proctor Dec. ¶¶ 3-10, 12.[1]

---

[1] Because the Tribe and Conservation Plaintiffs' suffered immediate procedural harm, NMA's allegation that "Plaintiffs' only discernible allegation of present 'harm' is … their self-generated cost of commenting on and litigating BLM's federal coal decisions" is without merit.  NMA Resp. 8.

Federal Defendants suggest—without support—that Plaintiffs must demonstrate their use of every single area affected by S.O. 3348. Fed. Resp. 19 (alleging that Plaintiffs have not alleged an interest in "unidentified locations"). The Ninth Circuit has already rejected this position, upholding a plaintiff's standing to challenge a programmatic environmental impact statement ("PEIS") for a nationwide program based on its members' interests in the program's implementation in a single state: "That the PEIS also applies to other geographic regions that [the plaintiff] does not visit is irrelevant to the standing analysis." WildEarth Guardians, 795 F.3d at 1152, 1155; see also W. Watersheds Project, 632 F.3d at 485 (finding that plaintiffs had standing to challenge nationwide grazing regulations based on declarations documenting their members' interests in particular grazing allotments). Thus, Plaintiffs' documented interests in mines affected by S.O. 3348 in Montana, Wyoming, and Utah afford them standing to challenge S.O. 3348 as a whole.

Federal Defendants further misapply Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013), to argue that Plaintiffs can only show standing if their injury is "certainly impending." Fed. Resp. 17-18. In contrast with the allegations of future injury at issue in Clapper, 568 U.S. at 409, here, Plaintiffs' procedural injuries have already occurred. Sierra Forest Legacy, 646 F.3d at 1179 (holding that "a procedural injury is complete" when an agency takes action without complying

with NEPA); see also Parsons v. U.S. Dep't of Justice, 801 F.3d 701, 712 (6th Cir. 2015) (applying Clapper's "certainly impending" standard to a plaintiff's allegations that government action has a "chilling effect," but not to procedural injury allegations, noting that "[c]laims for violations of procedural rights are treated uniquely under the standing inquiry"); Idaho Conservation League v. U.S. Forest Serv., No. 2:12-CV-00004-REB, 2014 WL 912244, at *5 n.4 (D. Idaho Mar. 10, 2014) (noting that Clapper does not instruct the standing analysis for procedural injuries). These allegations therefore satisfy the injury-in-fact test.

"Once a plaintiff has established an injury in fact under NEPA the causation and redressability requirements are relaxed." W. Watersheds Project, 632 F.3d at 485 (quotation omitted); see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 572 n.7 (1992) (stating that a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy"). Plaintiffs "must show only that they have a procedural right that, if exercised, could protect their concrete interests." W. Watersheds Project, 632 F.3d at 485 (quotation omitted); see also Cottonwood Envtl. Law Ctr., 789 F.3d at 1082 (same). Plaintiffs' procedural rights under NEPA satisfy this standard. In particular, had Federal Defendants prepared an EIS before ending the moratorium, they would have been required to engage in formal consultation with the Tribe about these impacts. 40 C.F.R. § 1501.7(a)(1). By

skirting their NEPA obligations, Federal Defendants deprived the Tribe of this necessary procedure for informing the Federal Defendants' decision to authorize new leasing.  See Walksalong Dec. ¶¶ 14-15.  Similarly, Federal Defendants' failure to comply with NEPA deprived Plaintiffs of the "opportunity to influence the disposition" of coal-lease applications, and eliminated any potential for NEPA review to result in "safeguards and decisions around federal coal leasing that would lessen, if not eliminate, the harms [Plaintiffs] currently experience when recreating on public lands" adjacent to mines.  Nichols Dec. ¶ 40.  Because "it is enough that [an] … EIS may redress plaintiffs' alleged injuries," W. Watersheds Project, 632 F.3d at 485 (quotation omitted), Plaintiffs satisfy the causation and redressability requirements of standing.

### B.     The Tribe and Conservation Plaintiffs' NEPA Claims are Ripe

The Tribe and Conservation Plaintiffs' NEPA claims also are ripe under Article III.  As with their attack on Plaintiffs' standing, Federal Defendants fail to acknowledge the procedural nature of their NEPA violation that is fundamental to the ripeness inquiry.  Thus, while Federal Defendants rely on Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726 (1998), to suggest that Plaintiffs' challenge to S.O. 3348 is unripe, Fed. Resp. 21-22, they fail to reference the Supreme Court's holding in that case that is dispositive of the ripeness issue here: "[A] person with standing who is injured by a failure to comply with the NEPA procedure may

10

complain of that failure at the time the failure takes place, for the claim can never get riper." Ohio Forestry Ass'n, 523 U.S. at 737; see also Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1070–71 (9th Cir. 2002) (holding that a NEPA challenge to BLM's adoption of a resource management plan ("RMP") was ripe because "any NEPA violation (and any procedural injury) inherent in the promulgation of an inadequate EIS for the … RMP have already occurred"). As the Ninth Circuit explained, "[t]he imminence of project-specific implementation 'is irrelevant to the ripeness of an action raising a procedural injury.'" Cottonwood Envtl. Law Ctr., 789 F.3d at 1084 (quoting Citizens for Better Forestry, 341 F.3d at 977). In such cases, when the procedural violation "is complete, so too is the factual development necessary to adjudicate the case." Id. (citation omitted). Accordingly, Plaintiffs NEPA claims are ripe.

### C.    S.O. 3348 is a Final Agency Action under the APA

Defendants' arguments that S.O. 3348 is not a "final agency action" subject to review under the APA, 5 U.S.C. § 704, lack merit. As with their flawed standing and ripeness arguments, Defendants' position falters on their erroneous claims that S.O. 3348 embodies a mere "policy preference" that lacks any legal or practical consequences. State Resp. 14; see Fed. Resp. 25 (stating, "SO 3348 merely establishes a policy that the agency will not defer proceedings on lease applications"). Because S.O. 3348 constituted the final word in Federal

Defendants' deliberations regarding whether to terminate the federal coal-leasing moratorium and had the effect of authorizing BLM to begin issuing leases, it is final for the purposes of APA review.  Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (adopting two-part test for evaluating finality).

S.O. 3348 satisfies the first prong of the Bennett test because it marks the "'consummation' of the agency's decisionmaking process."  Id. at 178 (citing Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948)).  In considering this first prong, courts "look to whether the action amounts to a definitive statement of the agency's position."  Or. Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006) (quotation omitted).  Courts eschew a formalistic analysis of the type of action required, instead adopting a "pragmatic" approach that focuses on the "practical and legal effects" of the challenged action.  Id.

Here, S.O. 3348 is not "tentative or interlocutory," Bennett, 520 U.S. at 178, but instead marks Federal Defendants' "last word on the matter" of the moratorium, Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 478 (2001). Secretary of the Interior Ryan Zinke issued S.O. 3348 following BLM's deliberation and final recommendation.  AR 13-26.  The result was to "revoke" the Secretary's prior action implementing the moratorium "effective immediately," and to "remain in effect until [S.O. 3348] is amended, superseded, or revoked."

12

AR 1-2.  Accordingly, this is not a case like <u>Center for Biological Diversity v.</u>

<u>Zinke</u>, cited by NMA, NMA Resp. 9, in which judicial review would "meddl[e] in

an agency's tentative, internal deliberations."  <u>Ctr. for Biological Diversity v.</u>

<u>Zinke</u>, 260 F. Supp. 3d 11, 29 (D.D.C. 2017).  Nor is this a case in which there was

no "decisionmaking process" that could yield an "identifiable agency order,

regulation, policy or plan that may be subject to challenge as a final agency

action."  <u>ONRC Action v. Bureau of Land Mgmt.</u>, 150 F.3d 1132, 1136 (9th Cir.

1998); <u>see</u> NMA Resp. 12 (discussing <u>ONRC Action</u>).  Rather, S.O. 3348 marked

the "consummation" of agency deliberations regarding the federal coal-leasing

moratorium and is therefore subject to APA review.  <u>Bennett</u>, 520 U.S. at 178.[2]

S.O. 3348 also satisfies the second prong of <u>Bennett</u>'s finality test, because

it generates "rights or obligations" and directs "legal consequences."  <u>Id.</u> at 177-78

(citing <u>Port of Boston Marine Terminal Ass'n. v. Rederiaktiebolaget</u>

<u>Transatlantic</u>, 400 U.S. 62, 71 (1970)).  The impact of the Secretarial Order is

concrete: S.O. 3348 repealed the moratorium on coal leasing, thereby authorizing

---

[2] NMA's position that "cessation of an ongoing NEPA process" is not final agency action is beside the point.  NMA Resp. 10.  Here, Plaintiffs challenge Federal Defendants' discrete and final decision to terminate the coal-leasing moratorium and authorize new leasing, not their decision to abandon a NEPA process. Accordingly, <u>Center for Biological Diversity</u>, which addressed an attempt to compel agency action unlawfully withheld under APA § 706(1), 260 F. Supp. 3d at 19-21, is inapposite.

coal leasing that previously was prohibited.  See, e.g., Havasupai Tribe v. Provencio, 876 F.3d 1242, 1250 (9th Cir. 2017) (holding that agency's mineral report was a final agency action because the report "was a practical requirement to the continued operation of" a mine on public lands); Cal. ex rel. Lockyer v. U.S. Dep't of Agric., 459 F. Supp. 2d 874, 891 (N.D. Cal. 2006) (holding that challenged action was final where it "repealed the protections afforded" by a prior management scheme), opinion clarified, No. C05-03508 EDL, 2006 WL 2827903 (N.D. Cal. Oct. 3, 2006), and aff'd, 575 F.3d 999 (9th Cir. 2009).  Moreover, S.O. 3348 satisfies the second prong of the Bennett test because it commands immediate compliance, directing BLM to "process coal lease applications and modifications expeditiously" and instructing all relevant federal offices to "make changes in their policy and guidance documents" to implement the order.  AR 2; see Or. Nat. Desert Ass'n, 465 F.3d at 987 (agency action generates legal rights and obligations where "immediate compliance with its terms is expected").  Further, Defendants are incorrect that S.O. 3348 is not final because it "does not alter the federal coal program" through a promulgated rule.  State Resp. 15; see also Fed. Resp. 25-26.  As the Ninth Circuit has affirmed, "Bennett's second requirement can be met through different kinds of agency actions, not only one that alters an agency's legal regime."  Or. Nat. Desert Ass'n, 465 F.3d at 987; see also Appalachian Power Co. v. E.P.A., 208 F.3d 1015, 1021 (D.C. Cir. 2000) ("'Interpretative rules' and 'policy

statements' may be rules within the meaning of the APA…although neither type of 'rule' has to be promulgated through notice and comment rulemaking.").[3]  Because S.O. 3348 generates legal consequences, it satisfies the second prong of the Bennett inquiry and is reviewable under the APA.[4]

## II.    FEDERAL DEFENDANTS VIOLATED NEPA

After Defendants' prolonged efforts to shield S.O. 3348 from judicial review, they offer little to support Federal Defendants' failure to prepare a PEIS before terminating the federal coal-leasing moratorium.  The defenses they do offer are meritless.  Consistent with their justiciability arguments, Defendants' NEPA arguments reflect an attempt to deflect attention from the concrete legal and environmental consequences of the decision to end the federal coal-leasing moratorium.  As long as the moratorium remained in place, "with limited

---

[3] NMA's reliance on S.O. 3348's language disclaiming the creation of enforceable rights or benefits to avoid judicial review is unfounded.  NMA Resp. 10.  "Courts consider whether the practical effects of an agency's decision make it a final agency action, regardless of how it is labeled."  Havasupai Tribe, 876 F.3d at 1249–50 (emphasis added) (quoting Columbia Riverkeeper v. U.S. Coast Guard, 761 F.3d 1084, 1094–95 (9th Cir. 2014)); see also Appalachian Power Co., 208 F.3d at 1023 (rejecting argument that "boilerplate" disclaimer in guidance document defeated finality).

[4] Because S.O. 3348 is a "final agency action," NMA's assertion that Plaintiffs' claims are improperly pled under 5 U.S.C. § 706(2) (authorizing claims to "set aside agency action") rather than § 706(1) (authorizing claims to "compel agency action unlawfully withheld or unreasonably delayed") is erroneous.  NMA Resp. 19 n.9.

exceptions," no new coal-leasing could occur.  AR 23.  While there is no doubt

that the decision to end the moratorium was driven by Federal Defendants'

changed policy preferences, at bottom, S.O. 3348 was designed to increase coal

mining.  In these circumstances, NEPA required Federal Defendants to examine

the environmental consequences of their decision.  This includes the climate

change effects of mining and burning coal and the environmental effects of

underpayment for federal coal by lessees.  See Plaintiffs' Opening Br. 20, 22; see

AR 1616-17 (2017 Scoping Report, recognizing that increasing payments for

federal coal would likely decrease coal production and environmental harm); AR

72188 (White House Council of Economics Advisors' report, stating "increasing

royalty payments to ensure a fair return to the taxpayer would decrease total coal

production in the United States and also decrease total nationwide emissions").

While Federal Defendants now disavow their pre-S.O. 3348 finding that "it would

not be responsible to continue to issue new leases" before these effects are studied,

AR 15983, they failed to justify their abrupt reversal.  See Plaintiffs' Opening Br.

21-34.  And NEPA also required Federal Defendants to examine the impacts of

new coal leasing on the Northern Cheyenne Tribe, which specifically requested

such consideration before any decision to end the moratorium.  Id. at 34-37.

 At the outset, it is important to clarify that—contrary to Defendants'

suggestions—the basis for the Tribe and Conservation Plaintiffs' NEPA claims is

not that Federal Defendants have a legal duty in the absence of final agency action to supplement the 1979 PEIS, i.e., the claim that failed in Western Organization of Resource Councils v. Zinke ("WORC"), 892 F.3d 1234 (D.C. Cir. 2018).  That is a convenient straw man of Defendants' making.  Instead of relitigating WORC, Plaintiffs' challenge is premised on NEPA's requirement for environmental review of "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  In this case, that "major federal action" is S.O. 3348.  As discussed below, that new action triggered NEPA's environmental analysis requirement regardless of any independent controversies surrounding the staleness of prior agency proceedings.  While a new EIS is warranted to address S.O. 3348's impact, id., the Tribe and Conservation Plaintiffs recognize that in certain circumstances, Federal Defendants may be able to comply with NEPA by preparing a supplement to the 1979 PEIS for the Federal Coal Program, 40 C.F.R. § 1502.9(c)(1)(ii).  Either way, S.O. 3348 was a new "major federal action" triggering NEPA's environmental review requirement.  42 U.S.C. § 4332(2)(C).

## A.    S.O. 3348 Was a Major Federal Action under NEPA

Federal Defendants' decision to open thousands of acres of public land to coal leasing constituted a "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Defendants' contrary arguments rest primarily on their assertion that terminating the coal leasing

17

moratorium was merely "a statement of policy" with no legal or environmental consequences.  Fed. Resp. 27.  However, Federal Defendants' decision to end the moratorium was their marquee response to a new Presidential direction to "spur coal mining in the U.S."  AR 14867; see also AR 10962 (request from presidential transition team for briefing on options to "reinvigorate leasing"); AR 15972_001 (press release quoting Secretary Zinke stating that S.O. 3348 would "bring[] jobs back to communities across the country").  While most new coal leasing was previously prohibited, S.O. 3348 specifically directed BLM to "process coal lease applications and modifications expeditiously in accordance with regulations and guidance existing before the issuance of Secretary's Order 3338."  AR 2.  Indeed, as Defendants observe, one of the primary reasons Federal Defendants gave for ending the moratorium was the "economic hardship" it allegedly caused to industry, including because "production of the coal [is] being delayed."  AR 25; see Fed. Resp. 14; State Resp. 10.  Defendants cannot have it both ways, attempting to justify S.O. 3348 to the public on the basis that it would reinvigorate coal leasing and mining on public lands, while claiming to this Court that S.O. 3348 is an inconsequential policy statement.  In fact and in law, S.O. 3348 was a "major federal action" necessitating NEPA review.  42 U.S.C. § 4332(2)(C).

NEPA required Federal Defendants to prepare a PEIS to evaluate the impacts of ending the prohibition on new coal leasing.  CEQ regulations provide

that "[a]gencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking."  40 C.F.R. § 1502.4(b).  Not only was S.O. 3348 meaningful from a planning and policy perspective—it restarted a federal coal leasing program that had been mostly halted—it is also the cause of significant environmental effects from coal-leasing and mining that would not have been possible absent its issuance.  See Pit River Tribe v. U.S. Forest Serv., 469 F.3d 768, 784 (9th Cir. 2006) (holding EIS was required before extending expired oil and gas leases where, "[w]ithout the affirmative re-extension of the 1988 leases, Calpine would have retained no rights at all to the leased property and would not have been able to go forward with the [development of a gas plant]"); Cal. Wilderness Coal. v. U.S. Dep't of Energy, 631 F.3d 1072, 1103 n.33 (9th Cir. 2011) (NEPA review required for agency decision that "create[d] authority for federal action … where no such authority previously existed").

These circumstances distinguish this case from Northcoast Environmental Center v. Glickman, 136 F.3d 660, 668 (9th Cir. 1998), cited by the State Defendants.  State Resp. 17.  While NEPA review may not be required on "guidelines and goals for … research, management strategies, and information sharing," which were at issue in Northcoast Environmental Center, 136 F.3d at 670, NEPA review is required to study programmatic decisions that pave the way

19

for future environmental consequences.  See Cal. Wilderness Coal., 631 F.3d at

1099-1101, 1099 n.28 (distinguishing Northcoast Envtl. Ctr., finding that agency

decision creating incentives for the siting of electric transmission facilities within

designated corridors changed the "status quo" and constituted "major federal

action").  Here, those consequences include the impacts of leasing and mining coal

that could not occur without Federal Defendants' decision to end the moratorium.

AR 25 (Nedd Memorandum, stating "no leasing decisions can be made until the

moratorium is lifted").[5]

Defendants wrongly claim that Plaintiffs did not "cite any case law

supporting their legal view that SO 3348 constitutes a proposal for major federal

action."  Fed. Resp. 28; see also State Resp. 19 (claiming that Plaintiffs "cite no

authority").  On the contrary, Plaintiffs cited Ninth Circuit authority applying

NEPA in very similar circumstances, authority Defendants chose to ignore.  In

particular, the Ninth Circuit in California ex rel. Lockyer vacated the U.S. Forest

Service's action repealing the National Forest Roadless Rule without first

preparing an EIS.  Cal. ex rel. Lockyer v. U.S. Dep't of Agric., 575 F.3d 999 (9th

---

[5] While Federal Defendants insist that there was no "proposal" for major federal
action here, Fed. Resp. 27, this Court need not analyze that question; because
Federal Defendants were long past the proposal stage when they took final action
to end the coal-leasing moratorium, NEPA applied.  Envtl. Def. Fund, Inc. v.
Andrus, 596 F.2d 848, 851 (9th Cir.1979) (rejecting argument that there was no
"proposal" for action, where agency is beyond "mere contemplation" and "action
has been taken").

Cir. 2009).  The Ninth Circuit observed that the very purpose of the challenged action was to "ensure that future land management decisions would never again be constrained by the Roadless Rule and its enhanced protections for inventoried roadless areas," and therefore rejected the Forest Service's claim that the repeal was "merely procedural."  Id. at 1018.  This rationale applies equally to Federal Defendants' repeal of the coal-leasing moratorium, which, like the repeal of the Roadless Rule, removed a management constraint that had "beneficial effect" on lands targeted for coal mining and the climate.  Id. at 1014.  S.O. 3348 thus met NEPA's "low threshold" for environmental review.  Id. at 1013.

Defendants' argument that NEPA applies only when BLM considers individual leases is contrary to the law.  Fed. Resp. 27; State Resp. 20.  "[B]road agency programs may constitute 'major Federal actions,' even though the programs do not direct any immediate ground-disturbing activity."  Cal. Wilderness Coal., 631 F.3d at 1098 (citations omitted).  Under Defendants' view, NEPA would not have been triggered by Federal Defendants' adoption of the coal-leasing program in the first instance.  However, Federal Defendants conceded at that time that NEPA required a PEIS for the coal-leasing program.  Kleppe v. Sierra Club, 427 U.S. 390, 400 (1976).  The Supreme Court observed, "[t]heir admission is well made, for the new leasing program is a coherent plan of national scope, and its adoption surely has significant environmental consequences."  Id.

21

The same is true of Federal Defendants' decision to end the moratorium and authorize new leasing.  S.O. 3348 committed Federal Defendants to aspects of the coal-leasing program—including climate change impacts and underpayment by coal companies for federal coal—that cannot be altered through lease-specific decisionmaking.  See Plaintiffs' Opening Br. 21-34.  Because "[f]uture decisions" at the lease level "will be constrained by" Federal Defendants' decisions at the program level, programmatic NEPA review was required.  California v. Block, 690 F.2d 753, 762-63 (9th Cir. 1982); see also Citizens for Better Forestry v. U.S. Dep't of Agric., 481 F. Supp. 2d 1059, 1067, 1089-90 (N.D. Cal. 2007) (change to programmatic forest-planning regulation triggered NEPA because it eliminated environmentally protective planning requirements that "in turn will likely result in less environmental safeguards at the site-specific plan level") (quotation and emphasis omitted).  Indeed, "[t]he fact that numerous individual EIS's will be required for many particular projects initiated pursuant to this national program does not diminish its potential environmental effect nationwide; rather, it attests to it."  Am. Pub. Transit Ass'n v. Goldschmidt, 485 F. Supp. 811, 833 (D.D.C. 1980) (finding that EIS of nationwide scope was required prior to enactment of certain transportation regulations, even though EISs would later be prepared for individual decisions implementing the regulations), rev'd on other grounds sub nom. Am. Pub. Transit Ass'n v. Lewis, 655 F.2d 1272 (D.C. Cir. 1981).

Defendants' reliance on the D.C. Circuit's decision in <u>WORC</u> is misplaced. There, the plaintiffs argued that BLM must supplement its NEPA review based on ongoing leasing activity that was authorized by the 1979 and 1982 regulations promulgating the federal coal-leasing program.  <u>WORC</u>, 892 F.3d at 1243. Rejecting this claim, the D.C. Circuit held that the plaintiffs "failed to identify any specific pending action, apart from the Program's continued existence, that qualifies as a 'major Federal action' under NEPA."  <u>Id.</u>  Indeed, the plaintiffs did not even attempt to identify an action they were challenging; rather, their case was based on BLM's "failure to act."  <u>Id.</u> at 1241.

In contrast with <u>WORC</u>, Plaintiffs here challenge Federal Defendants' final action to end the coal-leasing moratorium, embodied in S.O. 3348.  <u>See</u> <u>supra</u> Pt. I.C.  Defendants concede that "this distinction may alter the analysis," but nonetheless argue that the outcome must be the same.  Fed. Resp. 31; <u>see also</u> NMA Resp. 19 (stating "Plaintiffs' distinction is without a difference").  To the contrary, the <u>WORC</u> plaintiffs' failure to identify any specific action they were challenging was dispositive of the outcome in that case.  892 F.3d at 1241-44. NMA's suggestion that the D.C. Circuit "discussed" S.O. 3348 in reaching its conclusion is disingenuous, as that court's single reference to S.O. 3348 was in its recitation of the matter's procedural history, in which the court identified S.O. 3348 as the event that prompted the parties to lift a stay of the litigation.  NMA

23

Resp. 18 (citing <u>WORC</u>, 892 F.3d at 1241).  The D.C. Circuit did not consider S.O.

3348—which post-dated the district court litigation, was not part of the

administrative record, and was not challenged by the plaintiffs—in its NEPA

analysis.  <u>See generally</u> <u>WORC</u>, 892 F.3d at 1241-46.

The D.C. Circuit's decision in <u>Krueger v. Morton</u>, 539 F.2d 235 (D.C. Cir.

1976), concerning a 1973 moratorium halting the issuance of coal prospecting

permits, also fails to support Defendants' position.  <u>See</u> State Resp. 20-21.  There,

the court rejected the industry plaintiff's claim that an EIS was required for the

decision to institute the moratorium in part because, "so long as the suspension

stays in effect, irretrievable commitments are largely being avoided."  <u>Krueger</u>,

539 F.2d at 240 n.18 (alteration omitted) (quoting <u>Sierra Club v. Morton</u>, 514 F.2d

856, 862-64, 881 (D.C. Cir. 1975), <u>rev'd sub nom.</u> <u>Kleppe v. Sierra Club</u>, 427 U.S.

390 (1976)).  By contrast here, such irretrievable commitments <u>are</u> being made as

Federal Defendants "process coal lease applications … expeditiously" under

conditions where certain environmental consequences cannot be avoided or

mitigated.  AR 2.  Unlike a decision to halt development, such development

commitments mandate NEPA compliance.  <u>See</u> <u>California v. Block</u>, 690 F.2d at

24

762-63 (holding that programmatic NEPA review is required when "irreversible and irretrievable" commitments are made).[6]

Furthermore, contrary to the State Defendants' claim, the requirement to prepare an EIS before ending the coal-leasing moratorium not only is mandatory under NEPA, it is consistent with Federal Defendants' past practice.  State Resp. 21 (claiming that "BLM did not prepare an EIS before lifting the pauses in 1981 and 1987").  The Department of the Interior placed a moratorium on federal coal leasing in 1971, and completed the 1979 PEIS before lifting the moratorium in 1981.  AR 1544.  Congress instituted a subsequent leasing moratorium in connection with a study of whether federal coal leases were generating full market value, and that moratorium was not ended until after the Interior Department prepared a supplemental PEIS in 1986.  AR 1545 n.18.  Federal Defendants' 2017 decision to issue S.O. 3348 ending the coal-leasing moratorium without first preparing an EIS departed from this practice and violated NEPA.

### B.   Federal Defendants Offered No Legitimate Rationale for Reversing their Finding that New Coal Leases Would Make Irretrievable Resource Commitments

While Defendants argue that ending the coal-leasing moratorium was not a "major federal action" because it was allegedly inconsequential, they continue to

_____

[6] For this reason, NMA's suggestion that S.O. 3348 "was no more a major federal action subject to NEPA than" the decision to institute the moratorium in the first place, NMA Resp. 19, is wrong.

disregard Federal Defendants' prior determination that suspending coal leasing was appropriate to avoid "locking in for decades the future development of large quantities of coal" under "less than optimal" conditions.  AR 10.  In other words, the moratorium prevented BLM from issuing leases that cause environmental and socioeconomic consequences—i.e. irretrievable resource commitments—for which alternatives and mitigation measures exist only at the program level.  Now the Federal Defendants have begun coal leasing under S.O. 3348 and they are "locking in" those harmful consequences, contrary to their previously announced determination.  While Federal Defendants have discretion to make new policy, Fed. Resp. 35-36, they may not lawfully do so without first providing a "reasoned explanation" for their change of heart, Organized Vill. of Kake v. U.S. Dep't of Agric., 795 F.3d 956, 968-69 (9th Cir. 2015) (en banc) (quotation omitted).

Defendants do not even attempt to point to any reasoned explanation in the administrative record for abandoning their prior findings.  Instead, their strategy is to deny that Federal Defendants made any findings in the first instance.  Fed. Resp. 32-33; NMA Resp. 19-20.  This effort fails.  Federal Defendants specifically identified two particular areas as requiring review before the moratorium could be lifted:  1) the "impact of the program on the challenge of climate change;" and 2) measures to ensure a "fair return to Americans for the sale of their public coal resources."  AR 1604 (2017 Scoping Report).  Until Federal Defendants undertook

26

an evaluation of alternatives to address these effects, Federal Defendants conceded "it would not be responsible to continue to issue new leases."  AR 15983 (BLM Q&A document).  In Federal Defendants' efforts to deny the existence of such findings, they never confront these prior statements.  See Fed. Resp. 32-36.[7]

Despite Defendants' current position that no explanation was required before they could revoke S.O. 3348, BLM Acting Director Michael Nedd prepared a memorandum that attempted to do just that.  See AR 13-26 ("Nedd Memorandum").  However, as explained in the Tribe and Conservation Organizations' Opening Brief, the Nedd Memorandum's proffered rationale for ending the federal coal-leasing moratorium they previously deemed necessary was unreasoned and therefore arbitrary.  Plaintiffs' Opening Br. at 21-34.  None of the Defendants claim otherwise.  Indeed, Federal Defendants' only reference to the Nedd Memorandum in their brief is an elaborate footnote disavowing that document's rationale for finding that a PEIS was not necessary to evaluate the climate impacts of coal leasing.  Fed. Resp. 34-35 n.3.  The Nedd Memorandum's

---

[7] To be clear, because S.O. 3348 was a "major federal action," NEPA required Federal Defendants to evaluate the consequences of that action irrespective of any prior findings.  42 U.S.C. § 4332(2)(C); see supra Pt. II.A.  Federal Defendants' prior recognition that issuing new coal leases would generate irretrievable resource commitments in the areas of climate change and fair economic return simply reinforces this conclusion.

failure to provide a "reasoned explanation" for Federal Defendants' reversal of their prior findings—which Defendants do not attempt to defend—provides further evidence that the decision to terminate the coal-leasing moratorium without first preparing a PEIS was arbitrary, in violation of both the APA and NEPA. Organized Vill. of Kake, 795 F.3d at 968-69 (quotation omitted).

### C.   NEPA Required Federal Defendants' to Consider the Impacts of Ending the Moratorium on the Northern Cheyenne Tribe

Defendants do not deny the impacts on the Northern Cheyenne Tribe of ending the federal coal-leasing moratorium and opening up land adjacent to the Northern Cheyenne Reservation to new leases and mining.  Specifically, ending the moratorium allowed BLM to process four pending lease applications for the expansion of the Decker and Spring Creek mines in southeastern Montana, which together encompass approximately 427 million tons of coal and 4,000 acres.  See AR 92-94.  Because the decision to end the coal-leasing moratorium was a "major federal action," NEPA required Federal Defendants to evaluate the impacts of such leasing on the Northern Cheyenne Tribe.  42 U.S.C. § 4332(2)(C).  Federal Defendants fail to directly address this argument and make no mention of the closely analogous case, Northern Cheyenne Tribe v. Hodel, in which this District ruled that "[i]t appears obvious that the Department was required to consider the impacts, including social and economic impacts, of federal coal development on the Northern Cheyenne community" to comply with NEPA.  N. Cheyenne Tribe v.

<u>Hodel</u>, Case No. CV 82-116-BLG, 12 Indian Law Rep. 3065, 3068 (D. Mont. May 28, 1985), <u>rev'd on other grounds</u>, 851 F.2d 1152, 1158 (9th Cir. 1988).[8]

Federal Defendants' failure to consider the impacts to the Northern Cheyenne Tribe of ending the moratorium is particularly troubling because the Tribe specifically requested "government-to-government consultation … prior to any decision to lift or otherwise modify the moratorium."  AR 15200.  Tribal consultation is mandatory when federal agencies properly undertake NEPA review of proposed actions.  40 C.F.R. § 1501.7(a)(1).  Federal Defendants evaded this responsibility only by flouting their NEPA obligations.  Just as the Secretary of the Interior ignored the Tribe's consultation request before issuing S.O. 3348, Defendants in this case ignore the Tribe's distinct interests—and injuries— resulting from the decision to end the coal-leasing moratorium.  <u>N. Cheyenne Tribe v. Hodel</u>, 12 Indian Law Rep. at 3069.[9]

---

[8] Attached as Exhibit 1 to Plaintiffs' Opening Brief.

[9] Federal Defendants suggest that they satisfied their NEPA consultation obligations when they conducted scoping on the now-abandoned PEIS designed to study coal-leasing program reforms.  Fed. Resp. 42.  However, consultation in a process designed to <u>lessen</u> the environmental impacts from coal-leasing is not interchangeable with consultation on an action—S.O. 3348—designed to <u>open up new lands</u> to coal leasing.  Similarly, consultation at the leasing stage, <u>id.</u>, after Federal Defendants' already have committed to program-level impacts of federal coal-leasing, is also inadequate.  <u>See</u> <u>supra</u> Pt. II.A (discussing need for PEIS). NEPA requires consideration of "the environmental impact of <u>the proposed action</u>," not some other action, 42 U.S.C. § 4332(2)(C)(i) (emphasis added), and review must be commenced "at the earliest possible time," 40 C.F.R. § 1501.2.

Federal Defendants' failure to consider the impacts of S.O. 3348 on the

Northern Cheyenne Tribe violated NEPA.

## III.   BY VIOLATING NEPA, FEDERAL DEFENDANTS ALSO VIOLATED THEIR GENERAL TRUST OBLIGATION TO THE NORTHERN CHEYENNE TRIBE

Federal Defendants' violations of the APA and NEPA also violated Federal

Defendants' fiduciary obligations to the Northern Cheyenne Tribe.  See Plaintiffs'

Opening Br. 37-39.  Defendants offer no legitimate defense to this claim.

Federal Defendants argue that they do not owe a fiduciary obligation to the

Tribe with respect to management of non-Indian lands and resources.  See Fed.

Resp. 41.  But they fail to address (or even mention) cited precedent on point,

which is fatal to their claim.  In Pit River Tribe, the Ninth Circuit held that

procedural violations of NEPA that adversely impact a Tribe's interest in off-

reservation resources necessarily constitute violations of the United States'

fiduciary duty to the Tribe:  "Because we conclude that the agencies violated both

NEPA and the NHPA during the leasing and approval process, it follows that the

agencies violated their minimum fiduciary duty to the Pit River Tribe when they

violated the statutes."  469 F.3d at 788.  The Federal Defendants similarly fail to

mention that this District has twice expressly recognized the Secretary of the

Interior's fiduciary responsibility to the Northern Cheyenne Tribe when regulating

off-reservation coal on Federal lands.  See N. Cheyenne Tribe v. Lujan, 804 F.

30

Supp. 1281, 1285 (D. Mont. 1991); N. Cheyenne Tribe v. Hodel, 12 Indian Law

Rep. at 3070 ("The trust responsibility applies not only to on-reservation dealings

with tribal property and funds but also extends to other federal action outside the

reservation which impacts a tribe.").

Further, the cases relied upon by the Federal Defendants support the Tribe's

position.  Fed. Resp. 41.  In Inter Tribal Council of Ariz. v. Babbitt, 51 F.3d 199

(9th Cir. 1995), the Court dismissed the Tribe's claims because the applicable

statute (the Arizona-Florida Land Exchange Act) precluded judicial review, but in

so doing recognized a fiduciary duty to comply with applicable law when

managing off-reservation resources, stating that "the government owes no

fiduciary duty to the Tribes apart from its obligations under the [generally

applicable statute]."  Id. at 203 (emphasis added).  Similarly, in Gros Ventre Tribe

v. United States, 469 F. 3d 801 (9th Cir. 2006), the Ninth Circuit dismissed a

stand-alone breach of trust claim, but noted three times that the United States owes

a tribe a fiduciary obligation to comply with "generally applicable statutes and

regulations."  Id. at 810 (citations omitted); see also id. at 807, 812.  That is all the

Northern Cheyenne Tribe asserts in this case:  that Federal Defendants owed the

Tribe a fiduciary duty to comply with NEPA and the APA when taking off-

reservation action that impacts the Tribe, and breached that duty upon violating

those statutes.

Finally, the Federal Defendants argue that cited Mineral Leasing Act and NEPA regulations (43 C.F.R. § 3420.0-2 and 40 C.F.R. § 1501.7(a)(1)), which call for coordination and consultation with the Tribe during management of coal resources, are inapplicable in these proceedings and were not violated.  Fed. Resp. 42.  The Federal Defendants mischaracterize the Tribe's argument.  The Tribe cites the regulations as agency recognition of the important role of Tribal input throughout administration of the coal leasing program, and evidence that impacts to the Tribe are environmental impacts that must be considered under NEPA.   The regulations therefore support the conclusion that the Federal Defendants' failure to consult with the Northern Cheyenne Tribe and failure to consider impacts to the Tribe under NEPA violated the APA and NEPA, and in so doing, violated the United States' trust obligations to the Tribe.  See N. Cheyenne Tribe v. Hodel, 12 Indian Law Rep. at 3069-70.

## IV.   THIS COURT SHOULD VACATE S.O. 3348

Because vacatur of S.O. 3348 is the default remedy in cases under the APA—and Defendants have failed to argue against vacatur—Federal Defendants' claims that the test for injunctive relief applies in this case and that additional briefing is needed to address the appropriate remedy should be rejected.  The APA provides that the "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A) & (D).  As the Tribe and Conservation Plaintiffs demonstrated in their opening brief, vacatur is the appropriate remedy in this case.  Plaintiffs' Opening Br. 39-40.

Federal Defendants' assertion that "the factors for permanent injunctive relief" are relevant is wrong.  Fed. Resp. 26 (citing Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156-57 (2010)).  As the Supreme Court observed in Monsanto, if vacatur of an agency's action is sufficient to redress the plaintiff's injury, "no recourse to the additional and extraordinary relief of an injunction was warranted."  561 U.S. at 166 (citations omitted).  Such is the case here, where vacating S.O. 3348 would effectively reinstate the coal-leasing moratorium.  Paulsen v. Daniels, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force.") (citation omitted).

This Court should deny Federal Defendants' request for an opportunity to separately brief the issue of remedy following the Court's merits ruling.  Federal Defendants correctly observe that Plaintiffs do not seek additional remedy briefing, Fed. Resp. 26, and this is because the Tribe and Conservation Plaintiffs already briefed the issue as an element of their affirmative case, Plaintiffs' Opening Br. 39-40.  Defendants have waived further argument regarding the appropriate remedy in this case.  See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th

Cir. 2001) (affirming that "issues which are not specifically and distinctly argued and raised in a party's opening brief are waived") (citation omitted).  In any event, such further briefing would not be helpful to the Court, where vacatur is the appropriate remedy under the APA and established law in this Circuit.  5 U.S.C. § 706(2)(A) & (D); Alsea Valley All. v. Dep't of Commerce, 358 F.3d 1181, 1185 (9th Cir. 2004).

## CONCLUSION

For the foregoing reasons and those stated in the Tribe and Conservation Plaintiffs' opening brief, Federal Defendants violated NEPA, the APA, and their trust obligations to the Northern Cheyenne Tribe when they issued S.O. 3348 without first conducting environmental review.  Accordingly, the Tribe and Conservation Plaintiffs respectfully request that this Court grant their motion for summary judgment, vacate S.O. 3348, and reinstate the pre-S.O. 3348 federal coal-leasing moratorium.

Respectfully submitted this 16th day of October, 2018.

/s/ Jenny K. Harbine
Jenny K. Harbine
Earthjustice
313 East Main Street
Bozeman, MT 59715
jharbine@earthjustice.org
(406) 586-9699 | Phone
(406) 586-9695 | Fax

Edward B. Zukoski (*pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
tzukoski@earthjustice.org
(303) 623-9466 | Phone
(303) 623-8083 | Fax

*Counsel for Plaintiffs*

Wyatt F. Golding (*pro hac vice*)
Ziontz Chestnut
2101 Fourth Avenue, Suite 1230
Seattle, WA  98121
wgolding@ziontzchestnut.com
(206) 448-1230 | Phone
(206) 448-0962 | Fax

*Counsel for Plaintiff Northern Cheyenne Tribe*

Michael Saul (*pro hac vice*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
MSaul@biologicaldiversity.org
(303) 915-8308 | Phone

Anchun Jean Su (*pro hac vice*)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
jsu@biologicaldiversity.org
(510) 844-7100 | Phone
(510) 844-7150 | Fax

*Counsel for Plaintiff Center for Biological Diversity*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 7,990 words, in compliance

with the Court's June 2, 2017 Scheduling Order [Doc. 34].

        /s Jenny K. Harbine
       Jenny K. Harbine

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was today served via the Court's

CM/ECF system on all counsel of record.

/s/Jenny K. Harbine
Jenny K. Harbine