# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| CITIZENS FOR CLEAN ENERGY, et al., and THE NORTHERN CHEYENNE TRIBE, Plaintiffs, v. U.S. DEPARTMENT OF THE INTERIOR, et al., Federal Defendants, and STATE OF WYOMING, et al., Defendant-Intervenors. | **CV-17-30-GF-BMM** **ORDER** |
| STATE OF CALIFORNIA, et al., Plaintiffs, v. U.S. DEPARTMENT OF THE INTERIOR, et al., Federal Defendants, and STATE OF WYOMING, et al., Defendant-Intervenors. | **CV-17-42-GF-BMM** (Consolidated case) |

## INTRODUCTION

The Court held a hearing on December 13, 2018, on cross-motions for summary judgment filed in this consolidated action brought by the Center for Biological Diversity, Citizens for Clean Energy, Defenders of Wildlife, EcoCheyene, Montana Environmental Information Center, Sierra Club, the Northern Cheyenne Tribe, and WildEarth Guardians (collectively "Organizational Plaintiffs"), State of California, State of Washington, and the State of New Mexico (collectively "State Plaintiffs"), and by Defendants Secretary of Interior Ryan Zinke, the U.S. Department of Interior, the U.S. Bureau of Land Management (collectively "Federal Defendants"), the State of Wyoming, the State of Montana (collectively "State Defendants"), and the National Mining Association (collectively "Defendants"). For ease of reference the Court will use the generic terms Plaintiffs and Defendants unless an issue requires the Court to identify a specific party.

### A. PROCEDURAL HISTORY

Plaintiffs filed their Complaint in CV-17-30-GF-BMM on March 29, 2017. (Doc. 1.) The Court granted the State of Wyoming's Motion to Intervene (Doc. 25) on May 30, 2017. (Doc. 30.) The Court granted the parties Joint Motion to Consolidate Cases (Doc. 33) on June 2, 2017. (Doc. 34.) The Court granted National Mining Association's Motion to Intervene (Doc. 37) on July 10, 2017. (Doc. 41.)

The Court granted the State of Montana's Motion to Intervene (Doc. 39) on July 10, 2017. (Doc. 42.)

State Plaintiffs filed their Motion for Summary Judgement on July 27, 2018. (Doc. 115.) Organizational Plaintiffs filed their Motion for Summary Judgment on July 27, 2018. (Doc. 117.)  Federal Defendants filed their Cross Motion for Summary Judgment on September 7, 2018. (Doc. 123.) State Defendants filed their Cross Motion for Summary Judgment on September 19, 2018. (Doc. 125.) National Mining Association filed its Cross Motion for Summary Judgment on September 18, 2018. (Doc. 127.)

## B. FACTUAL BACKGROUND

The United States Government owns an approximately 570-million-acre coal mineral estate. (Doc. 118 at 12.) The Bureau of Land Management ("BLM") administers federal coal leases on the Government's estate. (Doc. 118 at 12.) The BLM possess broad discretion to lease public land for coal mining. (Doc. 118 at 12.) The BLM remains constrained, however, by the Federal Lands Policy and Management Act ("FLMPA") and the Mineral Leasing Act of 1920 ("MLA") (as amended by the Federal Coal Leasing Amendment Act). (Doc. 118 at 13.)

BLM currently manages 306 active federal coal leases in ten states. (Doc. 118 at 13.) The BLM managed leases account for an estimated 7.4 billion tons of recoverable coal. (Doc. 118 at 13.) Over forty percent of the coal produced in the

3

United States comes from federal land. AR-00004. Over eighty-five percent of coal

production on federal land in the United States occurs in the Powder River Basin

shared by Montana and Wyoming. *Id.*  BLM possessed forty-four pending lease

and lease-modification applications in February of 2017. (Doc. 118 at 14.) BLM

last commenced a comprehensive environmental review for the federal coal

program in 1979. (Doc. 118 at 14.)

### 1. Secretarial Order 3338

Former Secretary of the Interior Sally Jewell issued Secretarial Order 3338

(hereafter "the Jewell Order") on January 15, 2016. (Doc. 118 at 16.) The Jewell

Order directed BLM to prepare a programmatic environment impact statement

("PEIS") that addressed at a minimum the following issues:

> (a) how, when, and where to lease coal; (b) fair return to the American
> public for federal coal; (c) the climate change impacts of the federal coal
> program, and how best to protect the public lands from climate change
> impacts; (d) the externalities related to federal coal production, including
> environmental and social impacts; (e) whether lease decision should
> consider whether the coal would be for export; and (f) the degree to which
> federal coal fulfills the energy needs of the United States.

(Doc. 118 at 17.) the Jewell Order imposed a moratorium on new coal leasing until

completion of the PEIS. (Doc. 118 at 16.)

### 2. Secretarial Order 3348

President Trump issued an executive order on March 28, 2017, commanding

Secretary of the Interior Ryan Zinke to "take all steps necessary and appropriate to

amend or withdraw" the Jewell Order. (Doc. 118 at 20.) Secretary Zinke

subsequently issued Secretarial Order 3348 (hereafter "the Zinke Order") on

March 29, 2017. AR-00001-2 The Zinke Order determined that "the public interest

is not served by halting the Federal coal program for an extended time[.]" *Id.* The

Zinke Order further reasoned that Federal Defendant's consideration of potential

improvements to the coal leasing program did not require a PEIS. *Id.* The Zinke

Order lifted the moratorium and directed BLM to "process coal lease applications

and modifications expeditiously in accordance with regulations and guidance

existing before the issuance of" the Jewell Order. *Id.*

## C. LEGAL BACKGROUND

A series of federal statutes governs resolution of these motions.

### 1. National Environmental Policy Act

The National Environmental Policy Act ("NEPA") requires federal agencies

to "take a hard look" at the "environmental consequences" of their decision-

making. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)

(internal citations omitted). The statute "does not mandate particular results." *Id*.

NEPA instead "prescribes the necessary process" that agencies must follow to

identify and evaluate "adverse environmental effects of the proposed action." *Id*.

Such effects may be direct, "indirect," or "cumulative." 40 C.F.R. § 1502.16.

### 2. Mineral Leasing Act

The MLA governs the leasing of public land for coal production. The MLA authorizes the Secretary of the Interior ("Secretary") to divide lands that "have been classified for coal leasing into leasing tracts of such a size as [the Secretary] finds appropriate and in the public interest and which will permit the mining of coal." 30 U.S.C. § 201(a)(1). The MLA requires the Secretary, "in his discretion, upon the request of any qualified application or his own motion" to "offer such lands for leasing." *Id*. The MLA requires the Secretary to "award leases thereon by competitive bidding." *Id*. The MLA bars the Secretary from awarding a lease to a less than fair market value bid. *Id*. "No lease shall be held unless the lands containing the coal deposits have been included in a comprehensive land-use plan and such sale is compatible with such plan." 30 U.S.C. § 201(3)(A)(i).

### 3. Federal Land Policy and Management Act

The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701, et seq., dictates the framework under which BLM manages public lands. It is the policy of the United States, pursuant to FLPMA, that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA further states that the policy of the

United States requires that the "United States receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(8).

BLM accomplishes this directive by developing, maintaining, and revising RMPs. 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0–5(n). RMPs "guide and control future management actions." 43 C.F.R. § 1601.0–2. RMPs establish "[l]and areas for limited, restricted or exclusive use" and determine "[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained." 43 C.F.R. § 1601.0-5(n)(1)–(2).

## DISCUSSION

A court should grant summary judgment where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment remains appropriate for resolving a challenge to a federal agency's actions when review will be based primarily on the administrative record. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

The Administrative Procedure Act ("APA") standard of review governs Plaintiffs' claims. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481, 496 (9th Cir. 2011); *Bennett v. Spear*, 520 U.S. 154, 174 (1997). The APA instructs a reviewing court to "hold unlawful and set aside" agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

7

U.S.C. § 706(2)(A). A rational connection must exist between the facts found and the conclusions made in support of the agency's action. *Kraayenbrink*, 632 F.3d at 481. The Court reviews the Department's compliance with NEPA, the MLA, and FLPMA under the arbitrary and capricious standard pursuant to the APA. *See Center for Biological Diversity v. Nat'l. Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008). Federal courts shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Agency action "includes the whole or part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Courts have interpreted claims under 5 U.S.C. § 706(1) to compel "discrete agency action that [the agency] is required to take." *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 65 (2004).

## I.   ARTICLE III STANDING

Defendants assert that Plaintiffs allege conjectural harm, rather than any imminent threat, and thereby lack standing to bring their claims. (Doc. 124 at 27.) Defendants assert that a series of four events must occur to establish imminent harm: (1) an operator applies to lease land or to modify a lease where Plaintiffs' members recreate; (2) a BLM office completes an environmental assessment ("EA") or EIS and determines the fair market value of the coal and approves the

lease modification; (3) a surface mining permit is issued; and (4) the mining plan is approved. *Id.* at 28.

Defendants argue that none of these events can be characterized as imminent or impending. *Id.* Defendants argue further that Plaintiffs lack standing due to broad-ranging nature of the alleged harm that cannot be traced to the challenged action. *Id.* Defendants further argue that Plaintiffs have failed to demonstrate injury-in-fact because BLM has approved no leasing decisions since Secretary Zinke lifted the moratorium. *Id.*

Article III standing requires a plaintiff, or in the case of an organization, one of its members, to demonstrate: (1) injury-in-fact that is "concrete and particularized" and either "actual or imminent" and not "conjectural or hypothetical;" (2) a "causal connection" between the alleged injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision." *Defenders*, 504 U.S. 555, 560-61 (1992); *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

As an initial matter, Defendants' argument that Plaintiffs lack standing to pursue their NEPA claims until after individual leases have been processed and coal has been leased and mined proves unavailing. (Doc. 124 at 28.) Plaintiffs allege that Federal Defendants' conduct in failing to comply with NEPA before

9

ending the coal-leasing moratorium has inflicted a procedural injury. Plaintiffs' alleged procedural injury stems from the risk that takes place "when governmental decisionmakers make up their minds without having before them an analysis of the likely effects of their decision on the environment." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003). A programmatic analysis that may predetermine future decisionmaking "represents a concrete injury that plaintiffs must, at some point, have standing to challenge." *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1303 (9th Cir. 1994). Plaintiffs do not need to wait until after coal has been leased and mining has been approved in order to challenge an alleged procedural injury. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1179 (9th Cir. 2011).

## A. INJURY-IN-FACT

A plaintiff must show that the procedures at issue are designed to protect some "threatened concrete interest" to satisfy the injury-in-fact requirement. *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015). Plaintiffs' Complaint establishes the injury-in-fact requirement of standing. To demonstrate a concrete interest, a plaintiff must show "a geographical nexus between the individual asserting the claim and the location suffering an environmental impact." *Id.*

10

### 1. State Plaintiffs

State Plaintiffs consist of the states of Washington, California, New Mexico, and New York. Federal coal production occurs in New Mexico. AR-1550. Federal coal is transported via railways through California and Washington. Emissions of pollutants from power plants that burn federal coal inhabit New York's air. Coal production, transportation, and consumption affects adversely, in relevant part, air quality and water quality. AR-1584. The federal coal program, as of 2014, stands responsible for an estimated eleven percent of total United States greenhouse gas emissions. AR-1569. State Plaintiffs possess an interest in how the production, transportation, and/or consumption of coal affects the earth and air in their respective domains. *See State of Ga. v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). State Plaintiffs' interest proves concrete—the harms of which State Plaintiffs complain occur within each of the state's geographical boundaries. *W. Watersheds Project*, 632 F.3d at 485.

### 2. Organizational Plaintiffs

Organizational Plaintiffs likewise possess a concrete interest. The Western Energy (Rosebud), Decker, and Spring Creek mines surround the Northern Cheyenne Reservation. (Doc. 117-6 at ¶ 9.) Pending lease applications existed for the Decker and Spring Creek mines when the Jewell Order imposed a moratorium on new coal leasing. *Id*. at ¶ 12. Organizational Plaintiffs allege that coal mining at

11

the Decker and Spring Creek mines impacts the air and water quality on the reservation, destroys the habitats of sensitive species, and "destroys important cultural sites, including sites used for Cheyenne ceremonies." *Id*. at ¶ 10. Organizational Plaintiffs allege that pollution from coal mining at the Decker and Spring Creek mines equally affects a member-rancher's use of the Tongue River for irrigation and other agricultural purposes. (Doc. 117-2 at ¶ 4.)

Members further highlight that issuance of pending leases, that previously had been paused pursuant to the Jewell Order, will affect several members' use of areas in Montana, Wyoming, and Utah. (Docs. 117-1 at ¶ 14, 117-3 at ¶¶ 23-24, 38-39, 117-4 at ¶ 14, 117-5 at ¶ 12.) The members attest that the issuance of pending coal leases will increase the noise, air pollution, and visual impacts of coal mining adjacent to the areas in which members use the land. (Docs. 117-1 at ¶¶ 5-11, 14-15, 117-3 at ¶¶ 32-39, 117-4 at ¶¶ 8-15, 117-5 at ¶¶ 3-10, 12.). The Northern Cheyenne Tribe and Conservation Plaintiffs, through each of their members, allege an injury to its members' recreational and aesthetic interests. *See Friends of the Earth*, 528 U.S. at 183; *Cottonwood Environmental Law Center*, 789 F.3d at 1079.

## B. CAUSAL CONNECTION AND REDRESSABILITY

To establish a causal connection, a plaintiff must establish a "more than attenuated" line of causation between the challenged action and the alleged harm.

*Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011). "Once a plaintiff has established an injury in fact under NEPA the causation and redressability requirements are relaxed." *W. Watersheds Project*, 632 F.3d at 485. Plaintiffs must demonstrate "only that they have a procedural right that, if exercised, could protect their concrete interests." *Id.*

Plaintiffs have alleged a procedural right under NEPA. Plaintiffs allege that preparation of an EIS before ending the moratorium would require formal consultation with the Northern Cheyenne Tribe regarding coal-leasing impacts. *See* 40 C.F.R. § 1501.7(a)(1). Plaintiffs assert that Federal Defendants deprived the Northern Cheyenne Tribe of its right to participate in the scoping process. Plaintiffs assert that Defendants' failure to comply with NEPA deprived Plaintiffs of a meaningful opportunity to influence the disposition of coal-lease applications. The NEPA process proves sufficient to redress the procedural injuries that Plaintiffs allege. *See W. Watersheds Project*, 632 F.3d at 485. Plaintiffs have satisfied the causation and redressability requirements.

## II.   RIPENESS

Ripeness prevents the Court, "through avoidance of premature adjudication, from entangling [itself] in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the

challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). A party that possesses standing and asserts an alleged injury by an agency's failure to comply with NEPA "may complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry Ass'n*, 523 U.S. at 737.

The Court has determined that Plaintiffs have alleged a procedural injury related to Federal Defendants' failure to comply with the NEPA process in revoking the Jewell Order. Plaintiffs allege that the procedural injury occurred when Federal Defendants lifted the moratorium without preparing an EIS, or supplementing the PEIS. These events and the accompanying alleged procedural injury have occurred. Plaintiffs' challenge to the Zinke Order "may be their only opportunity to challenge [the coal-leasing program] on a nationwide, programmatic basis." *Cal. ex rel. Lockyer v. U.S. Dept. of Agriculture*, 575 F.3d 999 (9th Cir. 2009). Plaintiffs' NEPA claims are ripe for review.

## III.   NEPA AND THE APA

Plaintiffs argue that Federal Defendants' decision to lift the moratorium constituted a major federal action that remains subject to NEPA review. (Docs. 116 at 25; 118 at 24.) Plaintiffs argue further that Federal Defendants' decision not to prepare an EIS proves reviewable under the APA. (Docs. 129 at 16; 130 at 19.) The United States Supreme Court in *SUWA*, 542 U.S. 55, evaluated the same steps

at issue in this case: (1) whether NEPA imposed a duty to prepare an EIS, and (2) whether the agency's failure to prepare the EIS was actionable under the APA. 542 U.S. at 72-73 (determining that "[b]efore addressing whether a NEPA-required duty is actionable under the APA, [the court] must decide whether NEPA creates an obligation in the first place.") *Id.* at 72. The Court will follow the United States Supreme Court's approach in *SUWA*. The Court will first determine whether NEPA imposed a duty upon Federal Defendants to prepare or supplement the PEIS before analyzing whether the action is reviewable under the APA.

### A. NEPA

NEPA serves as "our basic national charter for protection of the environment." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (*quoting Ctr. For Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)). "NEPA requires that federal agencies perform environmental analysis before taking 'any major Federal actions significantly affecting the quality of the human environment.'" *Center for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (*quoting* 42 U.S.C. § 4332(2)(C)).

The existence of a NEPA triggering event "depends on whether there is a new proposed major Federal action." *Salazar*, 706 F.3d at 1094. The threshold to trigger NEPA remains "relatively low." *Lockyer*, 575 F.3d at 1018. A NEPA

15

triggering event requires merely that a plaintiff "raise substantial questions whether a project may have a significant effect on the environment." *Id.* (*quoting Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)).

NEPA does not always require an EIS to ensure that an agency has taken a "hard look" at potential environmental impacts. *Lockyer*, 575 F.3d at 1012. An agency may comply with NEPA through the preparation of the following documents and accompanying analysis: (1) an EIS; (2) a less extensive EA and a finding of no significant impact on the environment ("FONSI"); or (3) a categorical exclusion and finding that the action does not individually or cumulatively have a significant effect on the human environment. *Id.*; 40 C.F.R. § 1508.4.

Defendants argue that the Zinke Order constituted merely an agency policy to proceed with lease applications. (Docs. 124 at 35, 126 at 21.) Defendants assert that no NEPA triggering event occurred because no major federal action or final agency action existed. *Id.* Plaintiffs assert that NEPA required Federal Defendants to prepare a PEIS before lifting the moratorium. (Doc. 118 at 25.) Plaintiffs argue alternatively that NEPA required Federal Defendants to supplement the PEIS to address the new information related to the impacts of coal leasing since 1979. *Id.*

### 1.  The 2017 Lifting of the Moratorium

President Trump directed Secretary Zinke to "take all steps necessary and appropriate to amend or withdraw [the Jewell Order] . . . and to lift any and all moratoria on Federal land coal leasing activities related to [the Jewell Order]." AR-15904. Secretary Zinke issued the Zinke Order to end the federal coal-leasing moratorium and the PEIS process on March 29, 2017. AR-00001-2. The Zinke Order directed BLM to "process coal lease applications and modifications expeditiously in accordance with regulations and guidance existing before the issuance of [the Jewell Order]." AR-00002. Federal Defendants determined that a NEPA analysis related to the lifting of the moratorium proved unnecessary. *See* AR-00013. Defendants maintain that the Zinke Order did not constitute a major federal action that triggered NEPA. (Doc. 124 at 39.)

Defendants assert that the analysis in *Western Organization of Resource Councils (WORC) v. Zinke*, 892 F.3d 1234 (D.C. Cir. 2018), proves dispositive. (Docs. 124 at 40; 126 at 16; 128 at 23.) *WORC* involved a similar NEPA challenge at issue in the instant case. The plaintiffs in WORC claimed that the 1979 PEIS issued by the Secretary of Interior had grown outdated. *Id.* at 1237. The plaintiffs asserted that NEPA obligated the Secretary of the Interior to revise and update the PEIS when its conclusions become stale. *Id.* The plaintiffs argued that NEPA mandated the Secretary of the Interior to supplement the PEIS to account for the impacts of coal combustion on greenhouse gases in the atmosphere. *Id.*

17

The plaintiffs in *WORC* brought their cause of action in 2014. The district court determined that then-Secretary of the Interior Sally Jewell had not proposed any new action regarding the coal-leasing program. *Id.* (*citing W. Org. of Res. Councils v. Jewell*, 124 F. Supp. 3d 7 (D.D.C. 2015). Secretary Jewell issued the Jewell Order during the pendency of the plaintiffs' appeal. The D.C. Circuit initially held the case in abeyance. *WORC*, 892 F.3d at 1240. The plaintiffs moved to rescind the order holding the appeal in abeyance after the issuance of the Zinke Order. *Id.* The D.C. Circuit lifted the stay and set a briefing schedule. *Id.* The D.C. Circuit limited its review, however, to the issue of whether the Interior Department possessed a duty to update the PEIS due to its reliance on outdated information. *Id.*, at 1241.

The D.C. Circuit determined that "neither NEPA nor the [Interior] Department's own documents create a legal duty for the Secretary to update the . . . PEIS." *Id.* at 1246-47. The D.C. Circuit reasoned that no major federal action could be identified regarding the plaintiff's challenge. *Id.* at 1243. The Interior Department's approval of the 1979 PEIS constituted the major federal action at issue in *WORC*. *Id.* The plaintiff's argument that the continued reliance on the outdated coal-leasing program constituted a major federal action proved unavailing. *Id.* No pending action existed beyond the coal-leasing programs

18

continued existence. *Id.* NEPA did not require the Interior Department to update the PEIS after the major federal action had been completed in 1979. *Id.* at 1245.

The Jewell Order, and subsequent lifting of the moratorium through the Zinke Order, distinguish the D.C. Circuit's analysis in *WORC*. The D.C. Circuit did not address a challenge to the Zinke Order. The D.C. Circuit instead limited its analysis to determining whether the continued reliance on outdated information in the 1979 PEIS required the Interior Department to supplement the PEIS with new information. *See WORC*, 892 F.3d at 1246.

The circumstances of Plaintiffs' challenge to the Zinke Order differ from the circumstances that the D.C. Circuit analyzed and reviewed in *WORC*. Plaintiffs challenge the Zinke Order as the major federal action. The absence of any agency action beyond the Interior Department's continued reliance on the 1979 PEIS represented the fatal flaw in the plaintiff's argument in *WORC*. *Id.* The Zinke Order changed the status quo. The Zinke Order lifted the Jewell Order's moratorium and directed BLM to expedite coal leases. AR-00001. This action provides the agency action that proved missing from *WORC*.

Plaintiffs rely on *Lockyer*, 575 F.3d 999, to assert that the Zinke Order constituted a major federal action. *Lockyer* involved a nationwide plan directed by President Clinton to protect roadless areas in national forests. *Id.* at 1006. The Forest Service established the Roadless Area Conservation Rule ("Roadless

19

Rule"). *Id.* The Forest Service promulgated the Roadless Rule on January 5, 2001. *Id.* The Roadless Rule constituted a programmatic approach to roadless area management in the United States. *Id.* The Roadless Rule prohibited road construction, reconstruction, and timber harvest in roadless areas. *Id.* (*citing* 66 Fed. Reg. 3244 (Jan. 12, 2001).

The Roadless Rule's effective date was March 13, 2001. *Id.* A change in presidential administration delayed the effective date. *Id.* The Bush administration began working on a new rule know as the "State Petitions Rule" to replace the Roadless Rule in July of 2001. *Id.* at 1007. The Forest Service issued the final State Petitions Rule in 2005 following a period of public comment. *Id.* (*citing* 70 Fed. Reg. 25,654 (May 13, 2005)).

The Forest Service explained that it had designated the State Petitions Rule for a categorical exclusion under NEPA. *Lockyer*, 575 F.3d at 1008 (*citing* 70 Fed. Reg. 25,654, 25,660)). The Forest Service reasoned that the State Petitions Rule was "merely procedural in nature and scope and, as such, has no direct, indirect, or cumulative effect on the environment." *Lockyer*, 575 F.3d at 1008. The Forest Service never fully implemented the Roadless Rule and it had been legally valid only for seven months before being replaced by the State Petitions Rule. *Id.* at 1014.

The Ninth Circuit analyzed whether the Forest Service's action in replacing the Roadless Rule with the State Petitions Rule required an environmental analysis under NEPA. The Forest Service's argument that the seven-month period that the Roadless Rule had been in effect was "insufficient to make any meaningful difference in forest planning" failed to persuade the Ninth Circuit. *Id.* (emphasis omitted). The Ninth Circuit reasoned that the Roadless Rule's seven-month effective period resulted in benefits to roadless areas and their ecosystems. *Id.* The Forest Service had implemented the State Petitions Rule for the "primary purpose" of "taking substantive environmental protections off the books." *Id.* at 1015. The repeal of the Roadless Rule's substantive protections could not be characterized as "merely procedural." *Id.* at 1018. The Ninth Circuit concluded that the plaintiffs had raised a substantial question as to whether the repeal of the Roadless Rule would have significant effect on the environment. *Id.*

The analysis in *Lockyer* applies to the replacement of the Jewell Order with the Zinke Order. *Lockyer* involved a programmatic nationwide plan to address roadless areas. *Id.* at 1006. The Jewell Order involved a nationwide programmatic plan to reevaluate the coal-leasing program. AR-00008. The Bush administration repealed the Roadless Rule after it had been in effect for seven months. *Lockyer.* 575 F.3d at 1014. The Trump administration revoked the Jewell Order after the

coal-leasing moratorium had been in effect for nearly fifteen months and fourteen days. AR-00001-2.

The State Petitions Rule replaced the Roadless Rule. *Lockyer*, 575 F.3d at 1014. A plan to "process coal lease applications and modifications expeditiously" replaced the moratorium and PEIS process. AR-00002. The State Petitions Rule served to lift environmental protections in *Lockyer*. 575 F.3d at 1015. The Zinke Order served to re-open public land to coal leasing and to expedite lease applications. AR-00002. The Ninth Circuit reasoned in *Lockyer* that the seven-month period of forest protection resulted in benefits to roadless areas and their ecosystems. *Lockyer*, 575 F.3d at 1015. The moratorium similarly resulted in increased protection for nearly fifteen months of approximately 65,000 acres of public land that were subject to pending lease applications. *See* AR-15995-96.

One characteristic distinguishes *Lockyer* and the Zinke Order: the Forest Service in fact did initiate the NEPA process in relation to the State Petitions Rule at issue in *Lockyer*. The Ninth Circuit determined that the Forest Service's fault lay in designating the State Petitions Rule for a categorical exclusion from NEPA. *Lockyer*, 575 F.3d at 1018. Federal Defendants failed to initiate a single step of the NEPA process in relation to the Zinke Order. The process undertaken with regard to the Zinke Order failed to reach even the minimum level of environmental analysis performed in *Lockyer*.

Plaintiffs have identified potential environmental harm that could result from lifting the moratorium. Plaintiffs allege that the Zinke Order removed constraints that provided beneficial effects on public lands and the environment. (Doc. 118 at 27-28.) Plaintiffs allege that the current coal-leasing program remains outdated. *Id.* Plaintiffs allege that the moratorium provided an opportunity to examine the impacts of coal leasing on a programmatic basis. *Id.* Plaintiffs allege that the moratorium protected public lands of historical, cultural, spiritual, recreational, and vocational significance from development. (Doc. 1 at 7-8.) Plaintiffs argue that the Zinke Order immediately lifted those protections without any environmental review. *Id.*

Similar to the Forest Service's decision to repeal of the Roadless Rule as "merely procedural" in order to avoid environmental review, Federal Defendants in the present action circumvented any environmental analysis by characterizing the Zinke Order as a mere a policy shift and return to the status quo. Plaintiffs have raised a substantial question that the lifting of the moratorium could cause environmental impacts from expedited coal mining on public lands. *See Lockyer*, 575 F.3d at 1012. Plaintiffs need not show at this point that any significant effect actually will occur. *See Blackwood*, 161 F.3d at 1212. NEPA requires only that Plaintiffs raise a substantial question as to whether the project may cause significant environmental impacts. *Id.* (*citing Idaho Sporting Congress v. Thomas*,

23

137 F.3d 1146, 1149 (9th Cir. 1998). Plaintiffs have demonstrated that the lifting of the moratorium meets the "relatively low" threshold standard for a NEPA triggering event. *See Lockyer*, 575 F.3d at 1018. The Zinke Order constitutes a major federal action sufficient to trigger NEPA.

## B. FINAL AGENCY ACTION

The Court next must determine whether a final agency action exists to be reviewed under the APA. *SUWA*, 542 U.S. 55 (2004). NEPA provides no private right of action and thus Plaintiffs' claims must be brought under the APA. *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003). The APA authorizes suit by a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "Where no other statute provides a private right of action, the agency action complained of must be '*final* agency action.'" *SUWA*, 542 U.S. 55, 61-62 (*quoting* 5 U.S.C. § 704) (emphasis in original). "Agency action" refers to "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. 551(13).

Agency action proves final upon satisfaction of the following two conditions: (1) "the action must mark the 'consummation' of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature;" and (2) "the action must be one by which 'rights or obligations have been

determined,' from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

The Zinke Order meets the requirements for final agency action under *Bennett*. The Zinke Order explained that Secretary Zinke had revoked the Jewell Order "[b]ased upon the Department's review of [the Jewell Order], the scoping report for the [PEIS], and other information provided by the BLM[.]" AR-00001. Secretary Zinke relied on Federal Defendants' review in determining that halting the federal coal program did not serve the public interest. *Id.* Secretary Zinke further determined that the PEIS's completion proved unnecessary based upon Federal Defendants' review. *Id.* The decision to revoke the Jewell Order and expedite coal lease applications constitutes the consummation of Federal Defendants' decisionmaking on the moratorium and coal-leasing program. *See Bennett*, 520 U.S. at 177-78.

The Zinke Order additionally implicates legal consequences. The Jewell Order determined that over forty percent of coal production in the United States came from federal land. AR-00004. The Jewell Order provided a blanket moratorium on BLM administered coal development for the purpose of preparing a PEIS. AR-00003. The moratorium attempted to avoid the risk of "locking in for decades the future development of large quantities of coal under current rates and terms that the PEIS may ultimately determine to be less than optimal." *Id.* at 10.

25

The PEIS would evaluate concerns over outdated information within the coal-leasing program. *Id.* Plaintiffs have demonstrated that the moratorium provided protections on public lands for more than fourteen months.

The Zinke Order articulated its purpose as to "process coal lease applications and modifications expeditiously in accordance with regulations and guidance existing before the issuance of [the Jewell Order]." AR-00002. In other words, the Zinke Order served to lift the environmental protections that the Jewell Order had provided during the pendency of the preparation of a new PEIS. The legal consequences that flow from the Zinke Order are evident. With the Zinke Order's implementation, all BLM land became subject to lease applications with terms of twenty years. *See* AR-00010. The Zinke Order directed new lease applications to be "expedit[ed.]" *Id.* at 2. The PEIS process immediately stopped without full review of the concerns raised in the Jewell Order. The Zinke Order satisfies the legal consequences requirement under *Bennett*.

Federal Defendants further initiated a final agency action in their decision not to begin the NEPA process. Failure to act may constitute final agency action. 5 U.S.C. § 706(1). A "decision not to prepare an EIS or consult NEPA can itself be final agency action." *Forest Serv. Emps. for Envt'l Ethics v. U.S. Forest Serv.*, 397 F. Supp. 2d 1241, 1252 (*citing Hall v. Norton*, 266 F.3d 969, 975 (9th Cir. 2001)) (quotations omitted). Federal Defendants made a conscious decision not to initiate

the NEPA process. The record demonstrates that Federal Defendants rejected any NEPA review. AR-00001. Federal Defendants further reasoned that any environmental concerns raised by Plaintiffs could be addressed through BLM review outside the EIS process. AR-00014. Federal Defendants characterize the Zinke Order as a mere policy shift.

The Court has concluded that the Zinke Order constituted a major federal action. The Zinke Order constituted a NEPA triggering event. Federal Defendants' decision not to initiate the NEPA process pursuant to the Zinke Order satisfies the final agency action requirement. *See Forest Serv. Emps.*, 397 F. Supp. 2d at 1252 (*citing Hall v. Norton*, 266 F.3d at 975) (quotations omitted). The initiation of the NEPA process proves to be a "discrete agency action that it is required to take." *SUWA*, 542 U.S. at 64. Federal Defendants' decision not to initiate the NEPA process proves arbitrary and capricious.

## IV. WHETHER DEFENDANTS MUST PREPARE A PEIS

Plaintiffs request that the Court order Federal Defendants to complete the preparation of the PEIS that began under the Jewell Order. (Doc. 1 at 31.) Plaintiffs request alternatively that the Court order Federal Defendants to prepare a supplement to the PEIS. *Id.* NEPA represents a purely procedural statute. *Lockyer*, 575 F.3d at 1012 (9th Cir. 2009). NEPA's purpose constitutes the intent to "protect the environment by fostering informed agency decision-making." *Id.* NEPA "does

not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *High Sierra Hikers Ass'n. v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (*citing Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002)) (quotations omitted).

Federal courts cannot compel an agency to take specific actions. *See Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1221 (9th Cir. 2011) (*citing Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010)). Federal courts only can compel an agency to act upon its legislative command. *Id.* The decision of whether an EIS proves necessary pursuant to the agency's action "is a manner of action left to the agency's discretion." *Forest Serv. Emps.*, 397 F. Supp. 2d at 1254 (*citing SUWA*, 542 U.S. at 65).

Plaintiffs in *Forest Serv. Emps.* sought an order from the court to direct the Forest Service to prepare an EIS regarding its use of fire retardant to fight wildfires on Forest Service land. The court agreed with the plaintiffs that the Forest Service's use of fire retardant raised a substantial question as to the dumping of millions of gallons of fire retardant on national forests. *Forest Serv. Emps.*, 397 F. Supp. 2d at 1254. The court declined, however, to order the Forest Service to prepare an EIS as opposed to an EA. *Id.* The court recognized that the decision of

28

whether an EIS proves necessary pursuant to the agency's act represents a "manner of action left to the agency's discretion[.]" *Id.* (*citing SUWA*, 542 U.S. at 65).

The Zinke Order triggered NEPA. Federal Defendants must comply with the requirements of NEPA. The Court cannot compel Federal Defendants at this time to prepare a PEIS, or supplemental PEIS, as Plaintiffs request. This matter remains left to the agency to determine in the first instance. *See Gardner*, 638 F.3d at 1217; *Hells Canyon*, 593 F.3d at 932; *Forest Serv. Emps.*, 397 F. Supp. 2d at 1254.

As discussed previously, Federal Defendants may comply with their NEPA obligations in a manner of ways. 40 C.F.R. § 1508.4. Federal Defendants may determine that the preparation of an EA would satisfy their NEPA obligations. *See Blue Mountains Biodiversity*, 161 F.3d at 1212 (*citing* 40 C.F.R. § 1508.9). In the alternative, Federal Defendants may determine that the potential environmental impacts from the Zinke Order warrant the preparation of an EIS. *See id.* If Federal Defendants determine that an EIS would not be necessary, however, Federal Defendants must supply a "convincing statement of reasons" to explain why the Zinke Order's impacts would be insignificant. *See id.* (*quoting Save the Yaak*, 840 F.2d at 717). Federal Defendants have failed to take even the initial step of determining the extent of environmental analysis that the Zinke Order requires. The Court defers to Federal Defendants in the first instance to conduct its required

NEPA analysis. The Court stands in no position at this time to evaluate the sufficiency of that analysis. Federal Defendants must take this initial step.

## V.   PLAINTIFFS' REMAINING CLAIMS

Plaintiffs claim that the Zinke Order violated the Federal Government's trust obligation to the Northern Cheyenne Tribe. (Doc. 118 at 46.) Plaintiffs ground this claim in Federal Defendants' failure to prepare an EIS. *Id.* The Court has determined that the Zinke Order triggered the NEPA process. The Court also has determined that it lacks the authority to compel Federal Defendants to prepare an EIS at this point. Plaintiffs' claim based on the Federal Government's trust obligation proves contingent upon Federal Defendants' conclusions related to the NEPA review that the Court has ordered. The Court remains unable to evaluate this claim until Federal Defendants have completed their NEPA analysis.

Plaintiffs next assert that Federal Defendants failed to provide a reasoned explanation for replacing the Jewell Order with the Zinke Order. (Docs. 116 at 28 & 130 at 33.) State Plaintiffs allege that the MLA and FLPMA mandated Federal Defendants to ensure that leasing proved to be in the "public interest." (Doc. 116 at 28.) State Plaintiffs further assert that Federal Defendants failed to account for Secretary Jewell's preliminary findings that the public was not receiving fair market value from the sale of federal coal resources. *Id.* at 30.

Federal Defendants grounded their reasoning for reversing course in their conclusion that no NEPA triggering event had occurred pursuant to the Zinke Order. Federal Defendants assert that the mere policy-shift prompted by the Zinke Order did not trigger an environmental analysis. The Court's determination that the Zinke Order constituted a NEPA triggering event further prevents the Court from reviewing these claims at this time. Plaintiffs grounded their Complaint related to FLPMA and the MLA in "[Federal] Defendants' [failure] to complete an environmental review." (Doc. 1 at 23-24.) The Court has ordered Federal Defendants to initiate the NEPA process. The Court cannot reach these claims until Federal Defendants have completed their environmental review.

## CONCLUSION

Plaintiffs have demonstrated that they possess standing to challenge the Zinke Order. Plaintiffs have further demonstrated that their claims are ripe for review. The Zinke Order constituted a major federal action triggering NEPA review. The Zinke Order further meets the requirements for final agency action under the APA. The Court lacks the authority to compel Federal Defendants to prepare a PEIS, or supplement to the PEIS, at this time. Plaintiffs' remaining claims prove contingent upon Federal Defendants' initiation of the NEPA process and subsequent conclusions.

## REMEDIES

Defendants assert that Plaintiffs fail to address the factors for permanent injunctive relief set forth in *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). (Doc. 124 at 36.) Defendants request time to negotiate a proposed remedy briefing schedule and submit a joint proposal. *Id.* Permanent injunction is not an automatic remedy in a NEPA case. *Monsanto*, 561 U.S. at 157. An entry of a permanent injunction requires the Court to address the four equitable factors set forth in *Monsanto*.

Plaintiffs represent in their Complaint that BLM suspended pending lease applications during PEIS process. (Doc. 1 at     52.) Plaintiffs allege that a number of lease applications were pending in February of 2016 while the Jewell Order's moratorium was in effect. *Id.* Plaintiffs allege that the pending lease applications in 2016 encompassed at least 1.86 billion tons of coal in nine states. *Id.* Plaintiffs contend that this quantity represents roughly the equivalent to a four or five-year supply of federal coal. *Id.* at     53.

The Court directs counsel for all parties to confer in good faith to attempt to reach agreement as to potential remedies. The Court directs the parties to submit a joint proposal no later than thirty days from today's date if the parties reach an agreement regarding remedies. The Court directs the parties to submit additional briefing concerning *Monsanto* factors and remedies if the parties are unable to

reach an agreement. This additional briefing and proposed remedies shall address the current status of coal leasing, including the leases cited by Plaintiffs in their Complaint that had been affected by the moratorium. This information could impact the balancing of the four equitable factors under the analysis in *Monsanto*.

This briefing shall consist of one brief for Plaintiffs not to exceed 7,500 words. Federal Defendants shall be allowed one brief not to exceed 7,500 words. Intervenor Defendants shall be allowed collectively one brief not to exceed 5,000 words. The word limit shall include everything from the caption to the certificate of service.

## ORDER

It is hereby **ORDERED** that Plaintiffs' Motions for Summary Judgment (Docs. 97 & 99 in CV-17-42-GF-BMM; and Docs. 115 & 117 in CV-17-30-GF-BMM) are **GRANTED IN PART** and **DENIED IN PART**.

It is further **ORDERED** that Defendants' and Defendant-Intervenors' Cross-Motions for Summary Judgment (Docs. 105, 107, 109 in CV-17-42-GF-BMM; and Docs. 123, 125, 127 in CV-17-30-GF-BMM) are **GRANTED IN PART** and **DENIED IN PART**.

The parties shall meet and confer in good faith to attempt to reach an agreement as to remedies. The parties shall file a joint proposal regarding remedies within thirty days of today's date if the parties reach an agreement regarding

remedies. The parties shall submit additional briefing on the *Monsanto* factors and remedies no later than sixty days form today's date if the parties are unable to reach an agreement, in accordance with the above Order.

Entry of judgment will follow the imposition of a remedy in accordance with the above Order.


DATED this 19th day of April, 2018.



Brian Morris
United States District Court Judge