Jenny K. Harbine
Amanda D. Galvan
Earthjustice
313 East Main Street
Bozeman, MT 59715
jharbine@earthjustice.org
agalvan@earthjustice.org
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Plaintiffs*

Wyatt F. Golding (*pro hac vice*)
Ziontz Chestnut
2101 Fourth Avenue, Suite 1230
Seattle, WA  98121
wgolding@ziontzchestnut.com
(206) 448-1230 | Phone
(206) 448-0962 | Fax

*Counsel for Plaintiff Northern
Cheyenne Tribe*

Michael Saul (*pro hac vice*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
MSaul@biologicaldiversity.org
(303) 915-8308 | Phone

Anchun Jean Su (*pro hac vice*)
Center for Biological Diversity
1411 K St. NW, Suite 1300
Washington, D.C. 20005
jsu@biologicaldiversity.org
(202) 849-8401 | Phone

*Counsel for Plaintiff
Center for Biological Diversity*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| CITIZENS FOR CLEAN ENERGY, et al., <br><br>          Plaintiffs, <br><br> and <br><br> THE NORTHERN CHEYENNE TRIBE, <br><br>          Plaintiff, <br><br>       v. <br><br> U.S. DEPARTMENT OF THE INTERIOR, et al., | Case No. 4:17-cv-30-BMM <br><br><br> **[Proposed] FIRST SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Defendants,

and

STATE OF WYOMING, et al.,

Defendant-Intervenors.

STATE OF CALIFORNIA, et al.,

Plaintiffs,

v.

U.S. DEPARTMENT OF THE INTERIOR, et al.,

Defendants,

and

STATE OF WYOMING, et al.,

Defendant-Intervenors.

Case No. 4:17-cv-42-BMM
(consolidated case)

## INTRODUCTION

1.      Pursuant to Fed. R. Civ. P. 15(d), Plaintiffs file this supplemental complaint as a continuation of their challenge to Federal Defendants' failure to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, for Federal Defendants' 2017 decision to revoke a federal coal-leasing moratorium that had provided protections against leasing and mining coal from federal public land.

2.     This supplemental complaint incorporates by reference the factual and legal allegations of the Plaintiffs' March 29, 2017 complaint, and raises new allegations based on the events that followed Plaintiffs' filing of that complaint.

3.     This case challenges Federal Defendants' decision to issue Secretarial Order 3348 (the "Zinke Order"), issued on March 29, 2017, which opened leasing for the 255 billion tons of recoverable coal on the 570 million acres that comprises the federal mineral estate.  That decision threatens to unleash significant harm to water and air quality, public health, and our public lands.  Additionally, the leasing and mining of federal coal contributes significantly to our worsening global climate crisis, which Bureau of Land Management (BLM) has acknowledged "touch[es] nearly every aspect of public welfare." AR 1586.

4.     On April 19, 2019, this Court held that Federal Defendants violated NEPA by failing to evaluate the environmental consequences of the Zinke Order. Specifically, the decision to revoke the federal coal-leasing moratorium, embodied in the Zinke Order, immediately ended protections from most new coal leasing for all federal public land and constituted a "major federal action" triggering NEPA; the Zinke Order had immediate legal consequences, rendering it a final agency action; and thus, "Federal Defendants' decision not to initiate the NEPA process proves arbitrary and capricious."  Order at 24, 27 [Doc. 141] (Apr. 19, 2019) ("Order").

2

5.     Addressing Plaintiffs' NEPA claims, this Court ordered "Federal Defendants to initiate the NEPA process" and determine whether an EIS is ultimately necessary.  Id. at 29, 31.  Additionally it warned that "[i]f Federal Defendants determine that an EIS would not be necessary…Federal Defendants must supply a 'convincing statement of reasons' to explain why the…impacts would be insignificant."  Id. at 29.

6.     On February 25, 2020, Federal Defendants took this "initial step" by issuing an environmental assessment ("EA").  Bureau of Land Mgmt. ("BLM"), Final Envtl. Assessment, Lifting the Pause on the Issuance of New Federal Leases for Thermal (Steam) Coal (Feb. 25, 2020) ("EA").

7.     Rather than evaluating the impacts of opening all federal public lands to coal leasing, which had been prohibited under the moratorium, the EA expressly disclaims such an analysis.  EA at 14 (stating "BLM considered, but did not analyze in detail, the effects resumption of normal leasing procedures would have on leasing and evaluation of its potential effects").  Indeed, the EA does not consider the impacts of future leasing at all.  Instead, the EA evaluates the environmental impacts of just four federal coal leases that BLM already issued.  Id. at 11-12.

8.     The EA's arbitrarily limited scope and evaluation does not satisfy Federal Defendants' obligation to adequately consider the impacts of coal leasing

on federal public lands, and is, therefore, arbitrary, capricious, and contrary to NEPA.

9.     To prevent significant, unstudied impacts from federal coal leasing that would be prohibited under the moratorium, Plaintiffs Northern Cheyenne Tribe, Citizens for Clean Energy, ecoCheyenne, Montana Environmental Information Center, Center for Biological Diversity, Defenders of Wildlife, Sierra Club, and WildEarth Guardians (collectively, "Plaintiffs") request that this Court vacate the Zinke Order and reinstate the federal coal-leasing moratorium based on Federal Defendants' ongoing failure to comply with NEPA's requirement to evaluate the environmental consequences of revoking the coal-leasing moratorium.

## JURISDICTION AND VENUE

10.    This action arises under NEPA, 42 U.S.C. §§ 4321-4370h, its implementing regulations, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

11.    This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.  Plaintiffs bring this action pursuant to the APA, 5 U.S.C. § 706, which waives Defendants' sovereign immunity, see id. § 702.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because plaintiffs Citizens for Clean Energy, Montana Environmental Information Center, ecoCheyenne, and the Northern Cheyenne Tribe reside in the District of Montana and land affected by the challenged action is within the District of Montana.  Venue is proper in this Division because lead plaintiff Citizens for Clean Energy resides in Great Falls and federally owned coal subject to the federal coal leasing program lies in this Division.

## PARTIES

13.     Plaintiff Citizens for Clean Energy, Inc. ("CCE") is an all-volunteer group of Montana citizens from many backgrounds and political persuasions. CCE's objective is to convince decision makers that adequate, clean, efficient, and cost-effective energy for our community, state and world can be obtained without destroying our health, lifestyle, environment and heritage.  CCE members are united by a very deep concern about the harm fossil fuels cause to our world.  With all the wonderful resources available in this country, CCE asserts that there are many good solutions for clean power to serve our needs.  CCE believes the days of fossil-fuel-fired generators are now numbered.

14.     Plaintiff ecoCheyenne is a grassroots group of Northern Cheyenne tribal citizens formed to protect their environment from, among other things, the damaging impacts of coal mining.  For example, faced with the largest proposed

coal mine in the nation (the Otter Creek mine) and associated coal railroad along the pristine Tongue River and Otter Creek Valley—interrelated projects adjacent to the Northern Cheyenne Indian Reservation and in the midst of sites with irreplaceable historical, cultural, and spiritual significance—ecoCheyenne conducted a major educational push among Northern Cheyenne tribal members about the significant potential harms from both projects. ecoCheyenne also has partnered with members of the Lummi Nation of western Washington State to raise awareness about the impact of coal mining and burning, from the coal mines to the coal ports, on tribal communities throughout the Northwest.

15.     Plaintiff Montana Environmental Information Center ("MEIC") is a Montana-based nonprofit organization founded in 1973 with approximately 5,000 members and supporters throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the human environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations. MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution. MEIC and its members have intensive, long-standing

recreational, aesthetic, scientific, professional, and spiritual interests in the

responsible production and use of energy, the reduction of greenhouse gas

pollution as a means to ameliorate our climate crisis, and the land, air, water, and

communities impacted by fossil fuel development.

  16. Plaintiff Center for Biological Diversity ("the Center") is a non-profit

corporation headquartered in Tucson, Arizona, with offices in Washington, D.C., a

number of states, and La Paz, Mexico.  The Center believes that the health and

vigor of human societies and the integrity and wildness of the natural environment

are closely linked.  Combining conservation biology with litigation, policy

advocacy, and strategic vision, the Center is working to secure a future for animals

and plants hovering on the brink of extinction, for the wilderness they need to

survive, and by extension, for the welfare of generations to come.  The Center is

actively involved in endangered species and habitat protection issues nationwide

and in Mexico, and has more than 67,000 members throughout the United States

and the world, including 275 members who reside in Montana.  The Center has

members in Montana and throughout the United States who are harmed by

greenhouse gas emissions, mercury and other emissions from combustion of

federal coal, and loss of wildlife habitat and recreation opportunity from federal

coal leasing.  The Center and its members have participated in the coal

Programmatic Environmental Impact Statement process, and submitted detailed

scoping comments on the proposed federal coal leasing Programmatic

Environmental Impact Statement, along with more than 20,000 letters from the

Center's members and supporters.

17.     Plaintiff Defenders of Wildlife ("Defenders") is a non-profit,

membership organization headquartered in Washington, D.C. with field offices

throughout the country, including an office in Missoula, Montana.  Founded in

1947, Defenders is a science-based conservation organization with more than

393,000 members nationwide, including approximately 1,700 members in

Montana.  Many of Defenders' members reside and/or recreate within areas

impacted by the coal leasing moratorium.  Defenders is dedicated to the protection

of all native wild animals and plants in their natural communities and the

preservation of the habitats on which they depend.  Defenders advocates new

approaches to wildlife conservation that will help keep species from becoming

endangered, and it employs education, litigation, research, legislation, and

advocacy to defend wildlife and their habitat, including on federal

lands.  Defenders brings this action on its own institutional behalf and on behalf of

its members.

18.     Plaintiff Sierra Club is America's largest and most influential

grassroots environmental organization, with more than 2.7 million members and

supporters nationwide, including more than 2,500 who live in Montana.  Sierra

Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club has been engaged in both litigation and non-litigation advocacy aimed at reform of the federal coal leasing program for many years. Sierra Club staff and volunteer supporters attended each of BLM's listening sessions regarding the federal coal program in July and August 2015 that were held in Billings, Montana; Denver, Colorado; Gillette, Wyoming; Farmington, New Mexico; and Washington, D.C. Sierra Club members and supporters also attended each of the six scoping meetings held by BLM on the federal coal leasing programmatic environmental review process that took place in the summer of 2016 in Casper, Wyoming; Salt Lake City, Utah; Knoxville, Tennessee; Seattle, Washington; Grand Junction, Colorado; and Pittsburgh, Pennsylvania. Sierra Club continued to engage throughout this PEIS process by submitting detailed scoping comments to BLM along with more than 100,000 letters from its members and supporters.

19.     Plaintiff WildEarth Guardians is a non-profit conservation organization with major offices in Denver, Colorado; Santa Fe, New Mexico; and Missoula, Montana. Guardians' mission is to protect and restore the wildlife, wild

places, wild rivers, and health of the American West.  Guardians has more than

200,000 members and supporters, many of whom live, work, and/or recreate on

and adjacent to public lands in the West affected by federal coal mining and

combustion.  Through its Climate and Energy Program, Guardians utilizes

advocacy, media, and litigation to protect its members and members of the public

from the harm coal mining and coal combustion cause to air, land, wildlife, and

public health.

20.     Plaintiff Northern Cheyenne Tribe ("the Tribe") has been a federally

recognized Indian tribe since the Friendship Treaty of 1825.  See 81 Fed. Reg.

5,019, 5,022 (Jan. 29, 2016).  The Tribe's ancestral territory includes the Powder

River Basin of Montana and Wyoming.  The Tribe now occupies the Northern

Cheyenne Reservation ("the Reservation"), which is composed of approximately

444,000 acres of land in Big Horn County and Rosebud County, Montana.  More

than 99 percent of lands within the Reservation are held by the United States in

trust for the Tribe or the Tribe's members.  The Tribe also possesses off-

Reservation trust lands, including parcels along the Tongue River Reservoir in

close proximity to the Decker and Spring Creek coal mines in Montana.  The Tribe

has approximately 11,000 members, most of whom live on or in close proximity to

the Reservation.

21.     Protecting the Tribe's land and water is paramount to the survival and identity of the Northern Cheyenne.  Since contact with the U.S. Government and white settlers, the Tribe has sacrificed life and financial gain to maintain its lands and culturally and spiritually significant sites for future generations; protect culturally important plants and wildlife; preserve pristine air and water quality on the Reservation; and improve the difficult economic conditions endured by the Tribe's members and other residents of the Reservation.  For example, over the last four decades, the Tribe took legal action to regain control of the mineral rights underlying the Reservation in perpetuity; successfully challenged coal-related development that would have surrounded the Reservation, including in the Tongue River Valley; was the first tribe to designate its Reservation as a Class 1 air-quality region; adopted Tribal water-quality standards, which were approved by the U.S. Environmental Protection Agency; and facilitated designation of three National Historic Landmarks outside the Reservation: (1) Rosebud Battlefield-Where the Girl Saved Her Brother on Rosebud Creek; (2) Wolf Mountains Battlefield-Where Big Crow walked Back and Forth on the Tongue River; and (3) Deer Medicine Rocks on Rosebud Creek.

22.     Plaintiffs' members use, live, work, hunt, recreate, and engage in cultural and spiritual practices in areas adversely affected by coal mine operations that are likely to be expanded by leases for which there are pending applications,

11

and that may issue, now that the moratorium has been rescinded.  Their interests

extend to the land, air, rivers and streams, wildlife, and cultural and spiritual

resources that are harmed by coal mining.  In particular, Plaintiffs' members own

and use lands overlying and adjacent to potential coal leases, hunt for and seek to

view wildlife that would be displaced by new coal mining, breathe air and drink

water that is threatened by pollution from new coal mining, collect culturally

significant plants on lands that may be affected by potential coal leases, and

engage in ceremonial practices that would be adversely affected by new coal

mining.

23.    The aesthetic, conservation, recreational, wildlife preservation, and

cultural and spiritual interests of plaintiffs and their members, staff, and volunteers

are adversely and irreparably injured by the Federal Defendants' failure to follow

the procedures required by NEPA.  These are actual, concrete injuries that are

traceable to the Federal Defendants' conduct and would be redressed by the

requested relief.  Plaintiffs have no adequate remedy at law.

24.    Defendant U.S. Secretary of the Interior has supervisory responsibility

over the Department of the Interior and the BLM.  The Secretary is sued in his

official capacity.

25.    Defendant U.S. Department of the Interior is the federal department

that oversees the U.S. Bureau of Land Management.

26.     Defendant U.S. Bureau of Land Management ("BLM") is a federal agency within the Department of the Interior.  BLM is responsible for implementing the federal coal program, including administering federal coal leasing, and prepared the EA that is challenged in this case.

## BACKGROUND

27.     Plaintiffs rely on and incorporate their initial complaint in this matter, which provides an extensive discussion of the factual and legal background of the federal coal leasing program, the moratorium, and Federal Defendants' unlawful effort to overturn the moratorium.

28.     On April 19, 2019, this Court ruled that Federal Defendants violated NEPA by failing to engage in any environmental review before opening the door to previously prohibited coal leasing on public land.

29.     Addressing Plaintiffs' NEPA claim, the Court concluded that Plaintiffs raised "a substantial question as to whether the project may cause significant environmental impacts," and "[t]he Zinke Order constitutes a major federal action sufficient to trigger NEPA."  Order at 24 (citation omitted). Although the Court did not direct BLM to perform any specific type of NEPA analysis, the Court recognized that "[i]f Federal Defendants determine that an EIS would not be necessary … Federal Defendants must supply a 'convincing

statement of reasons' to explain why the Zinke Order's impacts would be insignificant." Id. at 29 (citation and quotation omitted).

30.     In its Order, the Court explained the effect of the Zinke Order, which was to "lift the environmental protections" under a 2016 order by then-Interior Secretary Sally Jewell, which directed both a moratorium on most new federal coal leasing and the preparation of a Programmatic Environmental Impact Statement ("PEIS") to study reforms to the coal leasing program.  Id. at 26.  "With the Zinke Order's implementation, all BLM land became subject to lease applications with terms of twenty years.  The Zinke Order directed new lease applications to be "expedit[ed.]  The PEIS process immediately stopped without full review of the concerns raised in the Jewell Order."  Id.

31.     The Court declined to rule on Plaintiffs' further claim that Federal Defendants' failure to comply with NEPA in turn violated their trust obligation to the Northern Cheyenne Tribe, stating "[t]he Court remains unable to evaluate this claim until Federal Defendants have completed their NEPA analysis."  Id. at 30.

32.     Immediately following the Court's summary judgment ruling, Federal Defendants commenced preparation of an environmental assessment that they claimed would remedy their failure in the first instance to evaluate the environmental consequences of the Zinke Order.  During this period, the Northern

Cheyenne Tribe renewed its request for government-to-government consultation with the Secretary of the Interior regarding the coal-leasing moratorium.

33.     On May 22, 2019, just five weeks after the Court's Order and without responding, once again, to the Northern Cheyenne Tribe's consultation request, Federal Defendants released a 35-page Draft EA and announced a 15-day public comment period on the Draft EA.  BLM later extended the comment period by 4 days to address a technical glitch with its online commenting system, but did not grant the numerous requests from members of the public, including Plaintiffs, for a lengthier extension necessary to afford a more meaningful opportunity for public involvement.  During the agency's short comment period, BLM received more than 47,900 comments from members of the public concerned about the impacts of coal leasing on our public lands, air, water, and climate.  EA at 12.

34.     On February 25, 2020, Federal Defendants released a Final EA.  BLM describes the purpose of the EA as an effort to "respond to the U.S. District Court of Montana's order issued on April 19, 2019, ... indicating that the Zinke Order constituted final agency action and a major Federal action triggering compliance with NEPA and directing the BLM to prepare an appropriate NEPA analysis."  EA at 11. Thus, the EA seeks only to evaluate the impacts of a decision BLM had already made, rather than to inform its decision whether to lift the federal coal-leasing moratorium and under what conditions.

35.     BLM's identification in the EA of a 'no action' alternative reflects the agency's truncated approach to environmental analysis.  A 'no action' alternative reflects the "status quo," and establishes a "baseline" against which the proposed action and its alternatives may be measured.  <u>Ctr. for Biological Diversity v. U.S. Dep't of Interior</u>, 623 F.3d 633, 642 (9th Cir. 2010).  However, the EA does not adopt a no-action alternative that reflects the status quo before the Zinke Order (i.e., the prohibition against new coal leasing embodied in the Jewell Order).  Instead, the EA's no-action alternative assumes that, following a comprehensive review of reforms to address identified problems with the federal coal-leasing program (as directed by the Jewell Order), Federal Defendants would have rejected all reforms, ended the moratorium, and restarted coal-leasing no later than March 2019.  EA at 16.  And absent that comprehensive review, which this Administration expressly abandoned, <u>id.</u> at 14, the EA assumes that the federal coal-leasing moratorium would nevertheless have been rescinded or simply expired in March 2019, <u>id.</u> at 16.  However, the moratorium itself contained no end date.  AR 10-12.  Absent an affirmative decision by Federal Defendants to end the moratorium—which this Court held is a major federal action triggering NEPA review—the moratorium would persist.

36.     In other words, the Final EA presumed the existence of the very decision—resumption of federal coal leasing—this Court directed Federal

Defendants to analyze, instead of providing decision makers and the public with a clear picture of the trade-offs involved in the decision whether to resume federal coal leasing, or not.

37.     As a result, the EA considers the environmental impacts of just four coal leases issued between March 2017 (when the Zinke Order terminated the moratorium) and March 2019 (when BLM presumes it would have ended the moratorium in the absence of the Zinke Order).  BLM did not consider the impacts of future leasing decisions beyond March 2019.  Even as to the four leases BLM considers, the EA evaluates the environmental effects of issuing the leases "between 1 and 11 months earlier than they could have been in the absence of the Zinke Order." Id. at 14.  The EA dismisses any broader consideration of the environmental impacts of resuming federal coal leasing, stating only that "[t]he BLM considered, but did not analyze in detail, the effects resumption of normal leasing procedures would have on leasing and evaluation of its potential effects because this issue does not relate to the purpose and need or inform a question of significance." Id.

38.     Other than the proposed action (the Zinke Order) and the no action alternative, the EA does not consider any additional alternatives, including alternatives that BLM previously identified as reasonable in its programmatic

review of the federal coal-leasing program under the Jewell Order.  See Complaint
¶ 50 [Doc. 1] (Mar. 29, 2017).

39.     Further, based on the limited scope of the EA, the BLM expressly opts
not to analyze several pertinent issues, including how the agency's proposed action
of lifting the moratorium would affect "BLM's leasing management framework for
issuing Federal coal leases and the potential associated impacts;" "the issuance of
Federal coal leases and the evaluation of potential impacts from such leasing"; and
"management of the greater sage-grouse and its habitat."  Id. at 13-15.

40.     Ultimately, based on the narrow scope of BLM's environmental
analysis, the EA concludes that BLM's proposed action would not "change the
cumulative levels of [greenhouse gas] emissions resulting from coal leasing," id. at
26; would not result in any "direct," "indirect," or "cumulative effects" to
socioeconomics," id. at 32; and would not "result in direct or indirect effects, or
cumulative effects to water resources (i.e., surface water, groundwater, and riparian
areas) beyond those studied in the NEPA analysis for the four leases issued
between March 2017 and March 2019," id. at 39.

41.     Based on the EA, on February 26, 2020, BLM issued a "Finding of
No Significant Impact" ("FONSI"), concluding BLM's environmental review
process.  Bureau of Land Mgmt., Finding of No Significant Impact, Lifting the

Pause on the Issuance of New Federal Coal Leases for Thermal (Steam) Coal at 11 (Feb. 26, 2020).

42.    Because the Zinke Order opens the door to federal coal leasing and its harmful environmental impacts with adequately evaluating those impacts or alternatives to avoid them—including in the EA—the Zinke Order and the federal coal leasing it authorizes continue to violate NEPA.

## FIRST CLAIM FOR RELIEF
### (Violation of NEPA and APA – Inadequate Scope of EA)

43.    Plaintiffs hereby reallege, reincorporate, and restate all previous paragraphs of this complaint and of the initial Complaint.

44.    NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  Under NEPA, federal agencies are required to take "a 'hard look' at how the choices before them affect the environment … to ensure … that the most intelligent, optimally beneficial decision will ultimately be made." Or. Nat. Desert Ass'n v. BLM, 625 F.3d 1092, 1099-1100 (9th Cir. 2008) (quotation and citations omitted).  As part of the NEPA process, federal agencies are required to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS.  40 C.F.R. § 1508.9.

45.     NEPA requires that an agency consider the full scope of activities

encompassed by its proposed action.  See 40 C.F.R. § 1508.25.  This includes a

consideration of connected, cumulative, and similar actions.  Id.; see also Delaware

Riverkeeper Network v. F.E.R.C., 753 F.3d 1304, 1314 (D.C. Cir. 2014) (stating

that "when determining the contents of an EA or an EIS, an agency must consider

all 'connected actions,' 'cumulative actions,' and 'similar actions'") (quoting 40

C.F.R. § 1508.25(a).

46.     Consistent with these requirements, NEPA recognizes the need for

programmatic environmental review when the connected actions under a federal

program "will have a compounded effect on a region."  Nat'l Wildlife Fed'n v.

Appalachian Reg'l Comm'n, 677 F.2d 883, 888 (D.C. Cir. 1981); see also Kleppe

v. Sierra Club, 427 U.S. 390, 400 (1976) (recognizing need for programmatic

environmental review of federal coal-leasing program); 40 C.F.R. § 1502.4(a), (b)

("Proposals or parts of proposals which are related to each other closely enough to

be, in effect, a single course of action shall be evaluated in a single impact

statement;" and "Agencies shall prepare statements on broad actions so that they

are relevant to policy and are timed to coincide with meaningful points in agency

planning and decisionmaking.").

47.     To satisfy these NEPA requirements for the Zinke Order, Federal

Defendants are required to conduct a programmatic review of BLM's all of

connected, cumulative, and foreseeable future coal-leasing actions.  Absent the

decision in the Zinke Order to repeal the federal coal-leasing moratorium, coal-

lease applicants would have no ability to move forward with most leasing and

subsequent mining.  The decision thus opened the door to the significant

environmental impacts that accompany mining under all of BLM's connected coal-

leasing activities.  Programmatic NEPA review is thus required because the

moratorium repeal gives rise to a comprehensive program with widespread,

cumulative environmental effects.  Kleppe, 427 U.S. at 400.

48.     Federal Defendants' EA fails to take a hard look at the full scope of

environmental consequences from their decision to open all federal public land to

coal leasing that had previously been off limits.  Indeed, the EA expressly

disclaims any such analysis on grounds that it "does not relate to the purpose and

need or inform a question of significance."  EA at 14 (stating "BLM considered,

but did not analyze in detail, the effects resumption of normal leasing procedures

would have on leasing and evaluation of its potential effects").

49.     Thus, the EA violates NEPA requirements for programmatic review

of broad or connected actions.  40 C.F.R. § 1508.25; Kleppe, 427 U.S. at 400.

Further, because of its unlawfully constrained scope, the EA fails to identify the

significant environmental effects of such coal leasing, which require preparation of

an EIS.  42 U.S.C. § 4332(C); see 40 C.F.R. § 1508.27 (defining "significant" for

21

purposes of EA and FONSI).  Because the EA does not satisfy Federal Defendants'

NEPA obligations to fully evaluate the environmental consequences of rescinding

the federal coal-leasing moratorium, the Zinke Order is arbitrary, unlawful, and

should be vacated.

## SECOND CLAIM FOR RELIEF
(Violation of NEPA and APA – Improper No Action Alternative)

50.     Plaintiffs hereby reallege, reincorporate, and restate all previous

paragraphs of this complaint and of the initial Complaint.

51.     Related to the purpose and need statement for an agency's

environmental analysis of a proposed action, NEPA and its implementing

regulations also require consideration of alternatives to the proposed action,

including a 'no action' alternative that establishes baseline conditions.  42 U.S.C. §

4332(2)(C)(iii); 40 C.F.R. § 1508.9(b); 40 C.F.R. § 1502.14(d); Ctr. for Biological

Diversity, 623 F.3d at 642.

52.     "Establishing appropriate baseline conditions is critical to any NEPA

analysis. 'Without establishing the baseline conditions which exist ... before [a

project] begins, there is simply no way to determine what effect the [project] will

have on the environment and, consequently, no way to comply with NEPA.'"

Great Basin Res. Watch v. Bureau of Land Mgmt., 844 F.3d 1095, 1101 (9th Cir.

2016) (quoting Half Moon Bay Fishermans' Marketing Ass'n v. Carlucci, 857 F.2d

505, 510 (9th Cir. 1988)).  To that end, a baseline cannot assume "the existence of

the very plan being proposed." <u>Friends of Yosemite Valley v. Kempthorne</u>, 520

F.3d 1024, 1037-1038 (9th Cir. 2008) (quoting lower court decision).

53.     BLM's EA violates NEPA by adopting an unreasonable 'no action'

alternative that does not describe the status quo prior to the Zinke Order, and

instead presumed that the Secretary of the Interior would have terminated the

moratorium with or without the Zinke Order.  In other words, the EA's no action

alternative unlawfully presumed the existence of the very decision—resumption of

federal coal leasing—this Court directed Federal Defendants to analyze.

54.     Because the environmental impacts of a proposed action are compared

against the 'no action' alternative baseline, BLM's approach renders any

consideration of the environmental effects of the Zinke Order effectively

meaningless.  Further, because of its artificial and inaccurate baseline, the EA fails

to identify significant environmental effects of such coal leasing, which require

preparation of an EIS.  42 U.S.C. § 4332(C); <u>see</u> 40 C.F.R. § 1508.27 (defining

"significant" for purposes of EA and FONSI).  Accordingly, the Zinke Order is

arbitrary, unlawful, and should be vacated.

### THIRD CLAIM FOR RELIEF
(Violation of NEPA and APA –Failure to Consider Reasonable Alternatives)

55.     Plaintiffs hereby reallege, reincorporate, and restate all previous

paragraphs of this complaint and of the initial Complaint.

56.     NEPA requires that Federal Defendants' environmental analysis include a discussion of "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C); see 40 C.F.R. § 1508.9(b) (requirements for environmental assessments).  The requirement to consider reasonable alternatives "lies at the heart of any NEPA analysis."  California ex rel. Lockyer v. U.S. Dept. of Agric., 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006).

57.     The EA considered only two alternatives: the Proposed Action (terminating the coal-leasing moratorium in March 2017) and the unlawful no action alternative (terminating the coal-leasing moratorium in March 2019).

58.     BLM failed to consider any alternatives that reflect a change in Federal Defendants' leasing practices.  In particular, BLM failed to consider alternatives that it had previously deemed reasonable to evaluate reforms to the federal coal-leasing program that could reduce or avoid the environmental impacts of leasing federal coal under the current regulatory regime, including the options of reducing or ending federal coal leasing entirely.

59.     As a result of BLM's failure to consider a reasonable range of alternatives, the EA unlawfully allows for only one outcome—termination of the coal-leasing moratorium without implementing any reforms BLM previously identified as necessary—an action that had already occurred.  See Friends of

Yosemite Valley, 520 F.3d at 1039 (NEPA analysis ruled invalid where the studied "alternatives were not varied enough to allow for a real, informed choice").

60.     Federal Defendants' failure to consider a reasonable range of alternatives in the EA is arbitrary and capricious, an abuse of discretion, and unlawful under NEPA and the APA.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9; 5 U.S.C. § 706(2).  Accordingly, the Zinke Order is arbitrary, unlawful, and should be vacated.

## FOURTH CLAIM FOR RELIEF
(Violation of Trust Obligation to Northern Cheyenne Tribe)

61.     Plaintiffs hereby reallege, reincorporate, and restate all previous paragraphs of this complaint and of the initial complaint.

62.     The U.S. Supreme Court has long recognized the "undisputed existence of a general trust relationship between the United States and the Indian people." United States v. Mitchell, 463 U.S. 206, 225 (1983).  The trust duty commits the federal government to protect Indian tribes' rights, resources, and interests.  Cherokee Nation v. State of Ga., 30 U.S. 1, 2 (1831).  In discharging this responsibility, federal agencies must observe "obligations of the highest responsibility and trust" and "the most exacting fiduciary standards."  Seminole Nation v. United States, 316 U.S. 286, 296-97 (1942).

63.     To satisfy their trust obligation, "agencies must at least show 'compliance with general regulations and statutes not specifically aimed at

protecting Indian tribes,'" including NEPA's requirement to prepare an EIS for
major federal actions with potentially significant environmental effects.  Pit River
Tribe v. U.S. Forest Serv., 469 F.3d 768, 788 (9th Cir. 2006) (quoting Morongo
Band of Mission Indians v. F.A.A., 161 F.3d 569, 574 (9th Cir. 1998)); see also
Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior, 755 F.
Supp. 2d 1104, 1110 (S.D. Cal. 2010) (stating that "[v]iolation of this fiduciary
duty [to tribes] to comply with NHPA and NEPA requirements during the process
of reviewing and approving projects vitiates the validity of that approval and may
require that it be set aside").

64.     By failing to comply with NEPA and the APA in connection with the
decision to open federal public lands to coal leasing, Federal Defendants also
violate their trust responsibility to the Northern Cheyenne Tribe, which has
asserted particular interest in the potential for new coal leasing throughout the
Tribe's ancestral homelands, including lands near the Tribe's Reservation in
Southeast Montana.  In particular, Federal Defendants' EA fails to recognize the
potentially significant cultural, spiritual, environmental, and economic effects of
federal coal leasing on the Northern Cheyenne Tribe.  Further, by unlawfully
constraining the scope of their review, Federal Defendants also constrain the scope
of consultation with affected Tribes, including the Northern Cheyenne Tribe, that

is mandatory under NEPA and necessary to satisfy Federal Defendants' trust obligation.

65.    For this reason, too, the Zinke Order should be held unlawful and set aside.

## RELIEF REQUESTED

THEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that Federal Defendants' EA fails to comply with the legal requirements of NEPA;

2.    Declare that Federal Defendants' failure to meet the legal requirements of NEPA violated their trust responsibility to the Northern Cheyenne Tribe;

3.    Set aside and vacate the Zinke Order;

4.    Reinstate the federal coal-leasing moratorium;

5.    Award to Plaintiffs their reasonable fees, costs, and expenses, including attorney's fees, associated with this litigation; and

6.    Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 20th day of July, 2020.

/s Jenny K. Harbine
Jenny K. Harbine
Amanda D. Galvan
Earthjustice

313 East Main Street
Bozeman, MT 59715
jharbine@earthjustice.org
agalvan@earthjustice.org
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Plaintiffs*

Wyatt F. Golding (*pro hac vice*)
Ziontz Chestnut
2101 Fourth Avenue, Suite 1230
Seattle, WA 98121
wgolding@ziontzchestnut.com
(206) 448-1230 | Phone
(206) 448-0962 | Fax
*Counsel for Plaintiff Northern
Cheyenne Tribe*

Michael Saul (*pro hac vice*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
MSaul@biologicaldiversity.org
(303) 915-8308 | Phone

Anchun Jean Su (*pro hac vice*)
Center for Biological Diversity
1411 K St. NW, Suite 1300
Washington, D.C. 20005
jsu@biologicaldiversity.org
(202) 849-8401 | Phone

*Counsel for Plaintiff
Center for Biological Diversity*